**OPINION ON REHEARING EN BANC**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ETHEL LOUISE HILL,
    *Plaintiff-Appellant,*

  v.

LOCKHEED MARTIN LOGISTICS
MANAGEMENT, INCORPORATED,
    *Defendant-Appellee,*

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
  *Amicus Supporting Appellant.*

CHAMBER OF COMMERCE, of the
United States; EQUAL EMPLOYMENT
ADVISORY COUNCIL,
    *Amici Supporting Appellee.*

No. 01-1359

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
Margaret B. Seymour, District Judge.
(CA-99-2343-6-24)

Argued: May 7, 2003

Decided: January 5, 2004

Before WIDENER, WILKINSON, NIEMEYER, LUTTIG,
WILLIAMS, MICHAEL, MOTZ, TRAXLER, KING, GREGORY,
and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Traxler wrote the majority
opinion in which Judges Widener, Wilkinson, Niemeyer, Luttig, Wil-

liams, and Shedd joined. Judge Michael wrote a dissenting opinion in which Judges Motz, King, and Gregory joined.

---

**COUNSEL**

**ARGUED:** Ronald A. Rayson, Knoxville, Tennessee, for Appellant. Susan R. Oxford, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae Commission. Andreas Neal Satterfield, Jr., HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, L.L.C., Greenville, South Carolina, for Appellee. **ON BRIEF:** David A. Burkhalter, II, Knoxville, Tennessee, for Appellant. Nicholas M. Inzeo, Acting Deputy General Counsel, Philip B. Sklover, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae Commission. Stephen A. Bokat, Robin S. Conrad, Ellen D. Bryant, NATIONAL CHAMBER LITIGATION CENTER, INC., Washington, D.C., for Amicus Curiae Chamber of Commerce; Ann Elizabeth Reesman, Katherine Y.K. Cheung, MCGUINESS, NORRIS & WILLIAMS, L.L.P., Washington, D.C., for Amicus Curiae Council.

---

**OPINION**

TRAXLER, Circuit Judge:

Ethel Louise Hill brought this action against her former employer, Lockheed Martin Logistics Management, Inc. ("Lockheed"), claiming that she was wrongfully terminated from her employment because of her sex and age and in retaliation for her complaints of such discrimination. Hill alleged violations of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, *see* 42 U.S.C.A. §§ 2000e to 2000e-17 (West 1994 & Supp. 2003) and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.A. §§ 621 to 634 (West 1999 & Supp. 2003), as well as state law claims for such discrimination under the New York Human Rights Law, N.Y. Exec. Law § 290 to 301. We granted en banc review to decide

whether the district court properly granted Lockheed's motion for summary judgment. We affirm.

I.

Ethel Hill was hired by Lockheed as an aircraft sheet metal mechanic in 1987. In this capacity, she worked as part of a contract field team assigned to perform modifications to military aircraft at various military bases in the eastern United States, pursuant to contracts between Lockheed and the United States government. Thomas Prickett was Lockheed's program manager in charge of the contract field teams and Archie Griffin was the East Coast senior site supervisor for Lockheed, but they were rarely present at the individual military jobsites. Rather, Hill and the other aircraft mechanics were directly supervised by a "lead person" or "point of contact" at each military base, who reported to Griffin in the line of authority. The lead person was also responsible for enforcing the standard operating procedures ("SOP") of Lockheed and ensuring that the military contracts were satisfactorily performed at the jobsite.

In addition to the mechanics and the direct supervisor, Lockheed assigned a safety inspector to each military jobsite. Specific aircraft modifications scheduled to be performed under the military contracts were set forth in modification work orders ("MWOs"). The safety inspector was charged with checking the modifications to ensure that they had been completed in accordance with the required specifications. However, the inspector had no supervisory authority over the mechanics, nor any authority to discipline them. Like the mechanics, the safety inspector reported to and worked directly under the supervision of the lead person.

During her last eight months of employment with Lockheed, Hill received three written reprimands under Lockheed's SOP: (1) a reprimand issued by Ronald Souders, the lead person at Fort Bragg in North Carolina, for a violation of Rule 4 of the SOP — "[u]nsatisfactory quality or quantity of work" — under a MWO assigned to Hill in September 1997; (2) a reprimand and disciplinary suspension issued by Richard Dixon, the lead person at Fort Drum in New York, for Hill's violation of Lockheed's tool control safety policy in April 1998; and (3) a reprimand issued by Dixon at Fort Drum

for another violation of Rule 4 of the SOP under several MWOs assigned to Hill in April and May 1998. J.A. 112.

Lockheed's SOP 3.4.2 provides that "[a]n employee who receives a combination of two written reprimands not involving a suspension and one involving a suspension (not necessarily on the same rule) will be subject to discharge." J.A. 110. Thus, after Hill's third reprimand became warranted, Dixon contacted Griffin to obtain guidance on how to proceed and was told to follow the SOP. Dixon then forwarded the disciplinary paperwork to Griffin, who along with Prickett made the decision to terminate Hill under the provisions of the SOP. Hill was fifty-seven years old at the time. Her position was ultimately filled by a forty-seven-year-old male mechanic.

In June 1998, Hill filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission, charging sex and age discrimination and retaliation. She was issued a right-to-sue letter in April 1999. Hill then filed this action under Title VII, the ADEA, and the New York Human Rights Act, alleging that she was terminated by Lockheed "because of" her sex and age and in retaliation for her complaints of discrimination.[1] Hill acknowledges that Souders and Dixon, the lead persons on the Fort Bragg and Fort Drum jobsites respectively, acted without a discriminatory or retaliatory motive in issuing the three reprimands, and she does not dispute that she violated the standards and rules referenced in each reprimand. Hill also does not dispute that the three reprimands subjected her to termination under SOP 3.4.2, nor does she allege that Griffin or Prickett acted with a discriminatory or retaliatory motive when they made the decision to terminate her. Rather, Hill's allegation that she was discharged because of her sex and age is grounded in her claim that Ed Fultz, the safety inspector at Fort Drum, harbored a discriminatory animus against her, as evidenced by his calling her a "useless old lady" who needed to be retired, a "troubled old lady," and a "damn woman," on several occasions while they were working together. J.A. 240-241A, 245. According to Hill, this discriminatory animus, along with Fultz's desire to retaliate against her when she complained to

---

[1]The parties have agreed that the legal analysis applicable to the Title VII and ADEA claims control the outcome of the claims alleged under the New York Human Rights Act.

Dixon about his comments, led Fultz to report admittedly valid infractions that resulted in her second and third reprimands and which, when combined with her Fort Bragg reprimand, served as the basis for her termination under SOP 3.4.2.

Concluding that Hill failed to present sufficient evidence to support her claims of discrimination and retaliation by Lockheed's decision-makers, who terminated Hill without any such improper motivations, the district court granted Lockheed's motion for summary judgment. On appeal, a divided panel of this court reversed the district court's grant of summary judgment, holding that "Hill ha[d] proffered direct evidence of sex and age discrimination in the statements of [Fultz], who substantially influenced the company's decision to fire her" and that "Hill ha[d] proffered sufficient evidence to create a genuine issue of material fact about whether [Fultz's] reports . . . were issued in retaliation for her discrimination complaints against [him]." *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 314 F.3d 657, 659 (4th Cir. 2003). A majority of the active circuit judges thereafter voted to vacate the panel decision, and the court reheard the appeal en banc.

II.

We review the district court's grant of summary judgment de novo. *See Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We construe the evidence in the light most favorable to Hill and draw all reasonable inferences in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

III.

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1) (emphasis added). The ADEA similarly for-

bids "an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." 29 U.S.C.A. § 623(a)(1) (emphasis added).

A.

Generally speaking, a plaintiff may avert summary judgment and establish a claim for intentional sex or age discrimination through two avenues of proof.

First, a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex or age discrimination motivated the employer's adverse employment decision. The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor. In such cases, historically referred to as "mixed-motive" cases, it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons. *See* 42 U.S.C.A. § 2000e-2(m); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989).

Prior to enactment of the Civil Rights Act of 1991, the Supreme Court had recognized that adverse employment decisions could be motivated by both legitimate and discriminatory reasons. *See Price Waterhouse*, 490 U.S. at 241. To proceed under this mixed-motive theory, however, the plaintiff was required to offer direct evidence of discrimination. If the plaintiff was successful, the burden then shifted to the employer, who could escape liability by proving that it would have made the same decision in the absence of the discriminatory motivation. *See id.* at 276 (O'Connor, J., concurring).

In response to *Price Waterhouse*, Congress added § 2000e-2(m) to Title VII in the Civil Rights Act of 1991, providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment action." 42 U.S.C.A. § 2000e-2(m) (emphasis added). The effect of the amendment was to eliminate the employer's ability to escape liability in Title VII mixed-motive cases

by proving that it would have made the same decision in the absence of the discriminatory motivation. Rather, through such proof, the employer can now only limit the remedies available to the employee for the violation. *See* 42 U.S.C.A. §2000e-5(g)(2)(B). "On a claim in which an individual proves a violation under section 2000e-2(m)" and the employer "demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor, the court . . . may grant declaratory relief, injunctive relief, and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m)," but "shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." *Id.*

Since enactment of section 2000e-2(m), our cases have nonetheless adhered to *Price Waterhouse*'s requirement that a Title VII plaintiff present direct evidence to establish a mixed-motive discrimination case. *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (noting that a "plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if the plaintiff presents direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion" in reaching their decision (internal quotation marks omitted)); *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir. 1999) (same). Such proof, we held, commanded the production of "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995).

Recently, however, the Supreme Court considered whether direct evidence is required for a plaintiff to obtain a mixed-motive instruction under § 2000e-2(m); the Court held that no such "heightened showing through direct evidence" is required. *Desert Palace Inc. v. Costa*, 123 S. Ct. 2148, 2153 (2003). Relying upon the plain text of the statute, the Court held that a Title VII plaintiff "need only demonstrat[e] than an employer used a forbidden consideration with respect to any employment practice." *Id.* "In order to obtain an instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence," direct or circumstantial, "for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or

national origin was a motivating factor for any employment practice." *Id.* at 2155 (internal quotation marks omitted).[2]

The second method of averting summary judgment is to proceed under a "pretext" framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination. *See Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). To demonstrate the prima facie case of sex or age discrimination under the pretext framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *See Brinkley*, 180 F.3d at 607. If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Assuming the employer meets this burden of production, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-42 (2000) (internal quotation marks omitted); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993). In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons "were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143. At this point, the burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. Thus, the *McDonnell Douglas*

---

[2]It has been assumed that the "mixed motive" provision of the Civil Rights Act of 1991 does not apply to the ADEA and, therefore, that the burden-shifting and direct evidence requirements of *Price Waterhouse* continue to apply to such claims. Our decision, however, does not hinge upon the method, but upon the sufficiency of proof under either framework.

framework "serves to bring the litigants and the court expeditiously and fairly to this ultimate question." *Id.* at 253.

B.

Hill has pursued her sex and age discrimination claims under both the mixed-motive and pretext frameworks. Specifically, Hill asserts that she presented sufficient direct and circumstantial evidence to demonstrate that, even if her performance-related problems and accompanying reprimands were *a* motivating factor in Lockheed's decision to terminate her under the SOP, Fultz's discriminatory motivations rendered her termination by Lockheed the product of mixed-motives on Lockheed's part. In addition, Hill asserts that she has established a prima facie case of sex and age discrimination and that, because Fultz was involved in the events leading up to the termination decision, Lockheed's legitimate, nondiscriminatory reason for the termination — her reprimands and the SOP — can be considered a pretext for discrimination.

The district court concluded that Fultz's remarks did not constitute direct evidence of sex or age discrimination by Lockheed because Fultz did not make the employment decision to terminate her. In addition, the district court concluded that the plaintiff failed to establish a claim of discrimination under the pretext framework because Hill was not meeting Lockheed's legitimate expectations regarding her job performance when she was terminated, Lockheed had articulated a valid, nondiscriminatory reason for terminating Hill under its SOP, and Hill failed to establish that Lockheed's articulated reason was a pretext for an unlawful discriminatory motive based upon Fultz's involvement in the events leading up to the termination decision.

Although the Supreme Court eliminated any heightened requirement of direct evidence to establish a mixed-motive sex discrimination claim under Title VII, *see Desert Palace*, 123 S. Ct. at 2153, the fundamental basis for the district court's decision has not been affected. Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is

whether the plaintiff was the victim of intentional discrimination." *Reeves*, 530 U.S. at 153 (2000); *see Burdine*, 450 U.S. at 256. To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that "the protected trait . . . actually motivated the employer's decision." *Reeves*, 530 U.S. at 141 (internal quotation marks omitted). The protected trait "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* (internal quotation marks and alterations omitted); *cf. Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring) (noting that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden" of proving discrimination); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 678 (7th Cir. 2002) (noting that the pertinent inquiry is whether the decisionmaker, as opposed to other managers or subordinates, evaluated the aggrieved employee based upon discriminatory criteria).

IV.

In embarking upon a determination of who is a "decisionmaker" for purposes of discrimination actions brought under Title VII and the ADEA, we begin with the language of the statutes. Title VII and the ADEA provide that "[i]t shall be an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual . . . because of" such individual's sex or age. 42 U.S.C.A. § 2000e-2(a)(1); 29 U.S.C.A. § 623(a)(1). Both acts define the term "employer" as "a person engaged in an industry affecting commerce . . . and any agent of such a person." *See* 42 U.S.C.A. § 2000e(b); 28 U.S.C.A. § 630(b).

In evaluating the liability of an employer under the acts, we are guided by agency principles. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) (holding, in the context of a sexual harassment case brought under Title VII, that "[i]n express terms, Congress directed federal courts to interpret Title VII based on agency principles"). The discrimination statutes, however, do not make employers vicariously liable for the discriminatory acts and motivations of everyone in their employ, even when such acts or motivations lead to

or influence a tangible employment action. On the contrary, by defining employer to include "any agent" of the employer, Congress "evince[d] an intent to place some limits on the acts of employees for which employers . . . are to be held responsible." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 790-792 (1998).

In *Ellerth*, the Court defined the limits of such agency as encompassing employer liability for the acts of its employees holding supervisory or other actual power to make tangible employment decisions. *Id.* at 762 (holding that "[a]s a general proposition, only a supervisor, or other person acting with the authority of the company," can undertake a tangible employment action). Pertinent to our inquiry, the Court explained its reasoning as follows:

> Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. *E.g., Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (noting that the supervisor did not fire plaintiff; rather, the Career Path Committee did, but the employer was still liable because the committee functioned as the supervisor's "cat's paw"). The supervisor often must obtain the imprimatur of the enterprise and use its internal processes. *See Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir. 1992) ("From the perspective of the employee, the supervisor and the employer merge into a single entity").

> For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the

> employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate. In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability.

*Ellerth*, 524 U.S. at 762-763. Thus, "[i]n order to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority," the Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 764-65.

In *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990), cited by the *Ellerth* Court, the Seventh Circuit similarly applied agency principles to hold that an employer would be liable for the discriminatory employment actions taken by a supervisor. That court, however, developed a "cat's paw" or "rubber-stamp" theory for imposing liability upon an employer for the discriminatory motivations of a supervisor, even though the supervisor did not formally take the adverse employment action. After having been presented evidence that the plaintiff's supervisor was motivated by age discrimination, the court was confronted with the problem that the plaintiff was technically fired by a "Career Path Committee" which was unaware of the supervisor's prejudice. *Id.* at 405. The court held that if the committee "acted as the conduit of [the supervisor's] prejudice — his cat's paw — the innocence of its members would not spare the company from liability." *Id.* However, if the committee "was not a mere rubber stamp, but made an independent decision to fire Shager," there would be no basis for finding that the employer violated the ADEA. *Id.* at 406.

Similarly, in *Reeves v. Sanderson*, the Supreme Court evaluated an employer's liability for the discriminatory motivations of a supervisory employee in the context of a disparate treatment claim. *See Reeves*, 530 U.S. at 140. Reeves brought an action against his former employer, alleging that he was terminated because of his age in violation of the ADEA. Although there was no direct or circumstantial evidence that the formal decisionmakers for the employer harbored a

discriminatory motivation, the Court held that the employer was not entitled to judgment as a matter of law under the *McDonnell Douglas* framework because the "petitioner [had] introduced additional evidence that Chesnut," one of petitioner's superiors in the chain of authority, "was motivated by age-based animus and was *principally responsible* for petitioner's firing." *Reeves*, 530 U.S. at 151 (emphasis added). Specifically, "Chesnut had told [petitioner] that he 'was so old he must have come over on the Mayflower'" and "that he 'was too damn old to do his job.'" *Id.* (internal alterations omitted). A coworker had confirmed that there was an "obvious difference" in the way petitioner was treated by Chesnut, and there was evidence that Chesnut had supervised an efficiency study of only petitioner's line and placed only the petitioner on probation. *Id.* The *Reeves* Court also noted that the plaintiff had "introduced evidence that Chesnut was the *actual decisionmaker* behind his firing." *Id.* at 152 (emphasis added). Although Chesnut had only recommended the petitioner's termination to the formal decisionmaker, the formal decisionmaker was the company president and Chesnut's spouse, and there was testimony from a supervisor in the company that the company "employees feared Chesnut, and that Chesnut had exercised 'absolute power' within the company for 'as long as he [could] remember.'" *Id.* at 152 (internal alteration omitted); *see also id.* at 138 (noting that Chesnut was "described as wielding 'absolute power' within the company"). In sum, *Reeves* informs us that the person allegedly acting pursuant to a discriminatory animus need not be the "formal decisionmaker" to impose liability upon an employer for an adverse employment action, so long as the plaintiff presents sufficient evidence to establish that the subordinate was the one "principally responsible" for, or the "actual decisionmaker" behind, the action. *Id.* at 151-52.

On appeal, Hill asserts that *Reeves* does not define the outer contours of who may be considered a decisionmaker for purposes of imposing liability upon an employer. Instead, she urges us to adopt a "substantial influence" inquiry as the appropriate standard. Under Hill's theory, a subordinate employee would be fairly viewed an actual decisionmaker of the employer if the subordinate substantially influences an employment decision made by the formal decisionmaker. The EEOC also supports such a view, although it appears to ask that we go even further, urging us to hold that a subordinate employee substantially influences an employment decision whenever

the influence is sufficient to be considered *a* cause of the employment action, even if the formal decisionmaker did not simply rubber-stamp the biased subordinate's recommendation. We decline to endorse either view of the permissible limits of employer liability under Title VII and the ADEA.

First, we believe the statutes and governing precedents do not provide for such an expansive view of an employer's liability. Although in *Reeves* the Court did not embark upon an exhaustive reexamination of agency principles applicable to discrimination cases, the Court's clear emphasis upon who holds "actual decisionmaking" power and authority or who has "principal responsibility" for an employment decision is consistent with the limitations set forth in *Ellerth*. Such individuals, although perhaps not acting as formal decisionmakers, nonetheless act in a supervisory or managerial capacity as the agents of the employer. It is these individuals who must possess the requisite discriminatory motivation behind the adverse employment decision that they make or for which they hold principal responsibility.

Second, we note that, in the wake of *Shager*, our sister circuits have often applied a "cat's paw" or "rubber stamp" theory to determine employer liability for the discriminatory acts and motivations of supervisory employees who do not exercise formal decisionmaking authority. *See e.g., Gee v. Principi*, 289 F.3d 342, 345-47 (5th Cir. 2002); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 876-78 (6th Cir. 2001); *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001); *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 285-86 (3d Cir. 2001); *Wascura v. City of South Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001); *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2nd Cir. 2001); *Rios v. Rossotti*, 252 F.3d 375, 381-82 (5th Cir. 2001); *English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-28 (5th Cir. 2000); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999); *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1249-50 (11th Cir. 1998); *Griffin v. Washington Convention Center*, 142 F.3d 1308, 1310-11 (D.C. Cir. 1998); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (6th Cir. 1998); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 (7th Cir. 1998);

*Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997); *Walden v. Georgia Pacific Corp.*, 126 F.3d 506, 514-15 (3d Cir. 1997); *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1325 (8th Cir. 1994). In support of their positions as to how we should approach the issue, the parties have pointed us to various lines in different cases as being supportive of their view of the parameters of the theory. However, our review of the cases leads us to the conclusion that, while the courts often utilize the same terminology as that employed by the *Shager* court, they have not always described the theory in consistent ways, and rarely have they done so after a discussion of the agency principles from which the theory emerged and that limit its application.

We ultimately conclude that the more appropriate course is to focus upon the language of the discrimination statutes and Supreme Court precedents — which do not speak in such terms. Accordingly, we decline the opportunity to further parse the varying applications of the cat's paw or rubber stamp theory as employed by our sister circuits. Rather, we simply note that the premise behind the theory is not inconsistent with the statutes and Supreme Court precedent — at least insofar as the theory was originally conceived and used by courts employing the more literal meanings of those terms. The holding in *Shager* itself, for example, was quite limited. Employing agency principles, the court declined to allow an employer to insulate itself from discrimination on the part of a supervisor and dominant decisionmaker through the use of a formal decisionmaker who merely rubber-stamped or acted as a cat's paw for the supervisor's decision. *See Shager*, 913 F.2d at 405-06; *see also Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 623-24 (7th Cir. 2002); *Kramer v. Logan County Sch. Dist. No. R-1*, 157 F.3d 620, 624-25 (8th Cir. 1998); *Wascura*, 257 F.3d at 1247. The Court cites *Shager* in both *Ellerth* and *Faragher* with seeming approval and, although the terms are not used by the Supreme Court in *Reeves*, the Court's analysis in *Reeves* would seem to place it quite comfortably within that terminology. When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision, so long as he otherwise falls within

the parameters of the discrimination statute's definition of an employer or agent of the employer. *See Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (The "decisionmaker is the person responsible for the contested decision," but "[i]f there [is] competent evidence that the [formal decisionmaker] acted as [the subordinate's] 'cat's paw' and rubber-stamped his recommendation, we would consider [the subordinate] to be the decisionmaker regarding" the challenged action.); *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1100 (7th Cir. 2001) ("[A] decision-maker cannot act as the 'cat's paw' for another who harbors a discriminatory animus" or "be the 'conduit' of another's prejudice." Rather, "such a claim can survive only when there is a factual basis in the record for the assertion that the biased individual's prejudice was the motivation for the decision-maker's actions."); *but see Laxton v. Gap, Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (holding that "[t]he relevant inquiry is whether" the supervisor harboring a discriminatory animus "had influence or leverage over" the decisionmaking of those "principally responsible for the adverse employment action" (internal quotation marks omitted)).

To conclude, Title VII and the ADEA do not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer. Such a construction of those discrimination statutes would thwart the very purposes of the acts by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers. *See Reeves*, 530 U.S. at 151-52. However, we decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.

We can discern no precedential or practical basis upon which to depart from the inquiry as articulated and applied by the Supreme Court in *Reeves* — and to expand the contours of the acts — by embracing a test that would impute the discriminatory motivations of subordinate employees having no decisionmaking authority to the employer, and make them agents for purposes of the employment acts, simply because they have influence or even substantial influence

in effecting a challenged decision. Regarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision. This encompasses individuals who may be deemed actual decisionmakers even though they are not formal decisionmakers, such as in *Reeves*, where the husband of the formal decisionmaker wielded absolute power within the company, and in *Shager*, where the supervisor's reports and recommendation were merely rubber-stamped by the formal decisionmaking committee. In sum, to survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.

V.

With these principles in mind, we now turn to the question of whether Hill has presented sufficient evidence to demonstrate that she has been "the victim of intentional discrimination" by Lockheed based upon Fultz's actions. *Reeves*, 530 U.S. at 153.

As is often the case in corporate employment settings, the decision-making process at Lockheed involved several of Hill's supervisory employees. Specifically, Hill's supervisor, Dixon, made decisions in consultation with his superior, Griffin, to issue the second and third reprimands to Hill for her violations of Lockheed's rules and policies. Griffin, with Prickett's approval, then made the decision to terminate Hill under the SOP for work performance deficiencies documented in the three reprimands she received. It is undisputed that Dixon, Griffin, and Prickett were not motivated in any way by age or sex discrimination to make their decisions. Accordingly, in order to survive summary judgment under either proof framework, Hill must be able to hold Lockheed liable for the alleged discriminatory animus harbored by Fultz — the safety inspector present at the Fort Drum jobsite who held no formal disciplinary or supervisory authority over Hill, but who was involved in reporting the violations to Dixon that led to her second and third reprimands and, ultimately, her termination by Griffin and Prickett under the SOP. The derogatory comments and alleg-

edly discriminatory motives of Fultz are only relevant if he can be deemed a decisionmaker for, or agent of, Lockheed for purposes of the discrimination statutes. To make that determination, we must examine in more detail, and in the light most favorable to Hill, the undisputed facts that surround the events underlying her three reprimands and her ultimate termination.

## A.   The First Reprimand (Fort Bragg)

Although Hill does not challenge the validity of her first reprimand,[3] it is significant both because it is similar to her third reprimand and because it also serves as a predicate for Hill's ultimate termination under SOP 3.4.2. The reprimand was issued during Hill's assignment to Fort Bragg, North Carolina, in September 1997, for "[u]nsatisfactory quality of work," a violation of Rule #4 of the SOP. J.A. 124. Specifically, Hill was reprimanded for installing rivets that were too small to properly hold an antenna mount. Donald Wiggins, the safety inspector at Fort Bragg, wrote up the violation, and Ronald Souders, the lead person at Fort Bragg, issued it to Hill. Hill has admitted that this reprimand was properly issued and that Wiggins and Souders did not act unfairly or in a discriminatory manner towards her.

## B.   The Second Reprimand (Fort Drum)

In January 1998, Hill was assigned to work at Fort Drum in New York. Prior to Hill's assignment to Fort Drum, Griffin spoke with her about complaints he had received concerning her job performance. Griffin told Hill that her work had not been up to par and that, because the lead persons were ultimately responsible for "the quality of [her] work on the road" and "she had to be followed up on," the lead persons had expressed some resistance to her being assigned to their jobsites. J.A. 188. Hill's second written reprimand was issued

---

[3]Actually, Hill had received two prior reprimands on a Lockheed jobsite in 1995. Because these reprimands had been removed from Hill's record pursuant to Lockheed's SOP, they were not considered under SOP 3.4.2. The reprimand issued at Fort Bragg was considered to be the first reprimand for purposes of the termination decision.

approximately four months later by Richard Dixon, the lead person at that site, for Hill's violation of Lockheed's tool control policy.

Lockheed's tool control policy requires the aircraft mechanics to accurately account for their tools at all times and to promptly report lost or missing tools to their immediate supervisors. The importance of the policy is not in dispute. As acknowledged by Hill, the policy ensures that "all of the mechanics that are working around the aircraft . . . keep track of their tools so they don't get left in the aircraft." J.A. 76. All tools are marked for identification by the mechanic's initials or social security number, and the mechanic's toolbox is outlined, or "shadowed," so that missing tools are immediately apparent when the toolbox is opened.

In April, military employees at Fort Drum found a pair of blue-handled cutters bearing Hill's identification mark and gave them to Fultz, who had been assigned to the site as the safety inspector. Fultz, in turn, gave the cutters to Dixon. After consulting with Hill and Griffin, Dixon issued the following written reprimand and three-day suspension, in accordance with Lockheed's SOP:

> On 14 April 98 it was brought to my attention that your 4" Diagonal Cutters with Blue Handle Grips were found on a maintenance stand. You failed to bring it to my attention or the Inspector's attention that you lost or misplaced this tool. These cutters were held in my possession until you discovered they were missing. During Tool Inventory Check at close of business (COB) on 14 April 98, you were questioned as to the whereabouts of these cutters by the Inspector. Your answer: "I told Richard I had taken the tool home." Your toolbox was checked again on 15 April 98 in the morning and again at close of business. When asked if you had all your tools, your answer was "yes."

> On the morning of 16 April 98, after a very in-depth Safety Brief on F.O.D. and Tool Control, your toolbox was checked and a like pair of 4" Diagonal Cutters were in your toolbox, when I still held your original pair in my possession.

> When I confronted you at approximately 0900 hours on 16
> April 98, you denied the 4" Diagonal Cutters with the Blue
> Handle Grips, with your tool markings engraved in them,
> were yours.

J.A. 125-126. At the time the reprimand was issued, Hill's toolbox
was only partially "shadowed," a deficiency she corrected during her
three-day suspension.

Hill does not dispute that the reprimand and the three-day suspen-
sion were plainly authorized by Lockheed's disciplinary rules. Indeed,
Hill acknowledged that she could have been immediately terminated
under the SOP for this violation. Nevertheless, Hill claims that this
valid reprimand was rendered discriminatory by Fultz's involvement
in the incident. Specifically, Hill now denies that she ever discussed
the missing cutters with Fultz or told Fultz, "I told Richard [Dixon]
I had taken the tool home," as reflected in the reprimand. J.A. 125.
She claims that Fultz lied to Dixon about this conversation, which
caused Dixon to issue the reprimand.

Viewing the evidence in the light most favorable to Hill, we can
assume that Dixon would not have issued the reprimand to Hill had
Fultz not reported Hill's missing tool to him. In this respect, Fultz was
clearly involved in the events leading up to the reprimand, as were the
military personnel who found Hill's cutters and turned them in to
Fultz. But Hill's eleventh-hour claim that she and Fultz did not have
a discussion about the lost cutters prior to her reprimand creates no
material issue of disputed fact because such evidence is plainly insuf-
ficient to support a conclusion that Fultz was the actual decisionmaker
or the one principally responsible for Lockheed's decision to issue the
reprimand.

For purposes of this disciplinary action, we must look at the facts
as they appeared to Dixon, who met with Hill and made the decision
that disciplinary action was warranted. *See Kendrick*, 220 F.3d at
1231 (noting that in evaluating whether an employee has been disci-
plined or terminated "because of" a protected trait, we must "look at
the facts as they appear to the person making the decision" to disci-
pline); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th
Cir. 1998) (holding that plaintiff failed to establish pretext where

plaintiff was terminated after the employer conducted an investigation into a subordinate's allegations of misconduct on the part of the plaintiff and believed the allegations to be true, even though plaintiff presented evidence in the lawsuit that the allegations may have been false). The written reprimand completed by Dixon plainly set forth the information he had regarding Hill's lost tool, including the now-disputed conversation between Fultz and Hill, and was signed by Hill. Faced one-on-one by her immediate supervisor, a man that Hill freely agrees was acting without a personal discriminatory motivation, Hill had the opportunity to dispute any information which formed the basis of Dixon's decision to reprimand. Yet, there is no evidence, and no claim, that she did so.[4] Once Dixon informed Hill of the facts which formed the basis of his determination that a reprimand was warranted, it was incumbent upon her to dispute any basis for the reprimand at that time if she intended to complain later. *Cf. English*, 248 F.3d at 1011 ("A plaintiff cannot claim that a firing authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity to respond to and rebut the evidence supporting the recommendation."); *Willis*, 118 F.3d at 547-48 (holding that the "cat's paw" line of cases was not applicable where the decisionmaker investigated a subordinate's motives by meeting with the plaintiff before acting on the subordinate's adverse recommendation).

In addition, the record fails to support the claim that Fultz was principally responsible for the issuance of Hill's second reprimand because Dixon based his decision to reprimand Hill upon his belief that Hill had lied to Fultz. After Fultz told Dixon about his encounter with Hill, Dixon met with Hill about the incident. By that time, Hill had replaced the missing cutter in her toolbox and told Dixon she had all of her tools. When presented with the tool in Dixon's possession that bore her number, Dixon testified that Hill only acknowledged that it "*could* be hers." J.A. 252 (emphasis added). Hill also admits that, at the time Dixon was called upon to make a decision about the

---

[4]Nor, for that matter, is there any indication that she did so during her deposition. Hill's denial of the conversation with Fultz appears for the first time in the form of an affidavit, completed one day before her response to Lockheed's motion for summary judgment and four months after her deposition had been taken.

reprimand, she only acknowledged that the cutters "had my number on them," and "that's all I said." J.A. 78. Even during her deposition, Hill would only acknowledge that the cutters were "most likely" hers. J.A. 81. And, when she was asked in her deposition directly whether she had, in fact, lost a pair of diagonal cutters, Hill again refused to own up, testifying instead that, "I had so many, I actually could not answer that." J.A. 78.[5]

In short, when Dixon met with Hill, he was given no reason to view the facts any differently than they had been related to him, and at no time did Dixon testify that he based his belief that Hill was not being candid on Fultz's statement about the tool being taken home. On the contrary, Dixon testified that if Hill had acknowledged that she was missing a tool when he showed her with the cutters bearing her identification mark, she probably would not have received a written reprimand.[6] His concern was Hill's refusal to admit to him that

---

[5]Later, Hill admitted that she had only owned three pairs of cutters before Dixon gave her the disputed pair, and that she only had three pairs afterwards. But, even then Hill would only admit that she lost *a* pair of cutters, not *that* pair of cutters, and she raised the possibility that another person could have etched her number on the pair of cutters that was in Dixon's possession. Of course, even if that were true, a pair would still be missing and a safety concern would have still existed.

[6] Q:  And, of course, you relied on Mr. Fultz to be honest because that's a serious accusation when an employee is being dishonest?

  A:  That's right.

  Q:  Well, if she hadn't been dishonest, you would have treated her in a different way, wouldn't you?

  A:  . . . If she'd acknowledged, "yes, I'm missing a tool," wouldn't nothing ever been said.

  Q:  Okay. She wouldn't have been written up at all, would she?

  A:  Probably wouldn't've been wrote up at all.

  Q:  Okay. When did you . . . first talk to Mrs. Hill about it?

  A:  I talked to her the next morning, I believe. And in her box at that time was a tool. She said it was . . . there, she had her tools.

she had misplaced the tool. And, given the fact that the very purpose of the tool policy is to ensure that tools are not misplaced in an aircraft where they could wreak havoc and perhaps tragedy, one hardly wonders why Dixon felt it important that his aircraft mechanics be candid when confronted by him about missing tools.

In sum, the record does not support a finding that Fultz was the actual decisionmaker or the one principally responsible for Lockheed's decision to issue Hill her second reprimand for the violation of the tool control policy. Rather, Dixon obviously made an independent, non-biased decision that Hill had violated an important Lockheed safety policy, that Hill had not been forthright in her acknowledgment of her carelessness, and that a reprimand was warranted.

### C.   The Third Reprimand (Fort Drum)

After Hill completed her three-day suspension, she returned to work at Fort Drum. Over the next few days, Fultz issued six installation discrepancy reports to Hill for MWOs that Hill had signed off on

---

Q:   Okay.

A:   But I — at the time talking to her, I had the tool in my desk.

. . .

Q:   Did she acknowledge it later that they were?

A:   Could be hers.

Q:   Could be hers. Acknowledged that it had her number of it?

A:   Yeah. Had her number . . . .

. . .

Q:   So if she hadn't've lied to Mr. Fultz and told [him] that she had did that and then she had come in and ultimately acknowledged that these were hers, you wouldn't have written her up?

A:   I wouldn't. There wouldn't've been nothing said.

J.A. 251A-253.

as completed, but which Fultz determined to be unsatisfactory. Although not authorized to reprimand or discipline Hill or any other mechanics, Fultz was charged with checking modifications to ensure that they had been completed in accordance with the required contract specifications. He reported those discrepancies on Lockheed's standard installation "Discrepancy Record," in accordance with his job duties as safety inspector. J.A. 128-31. Dixon, however, investigated every discrepancy report before it was corrected and, with the exception of one, determined that all were accurate and legitimate write-ups. He also met with Hill about each discrepancy, who admitted that four of the five remaining discrepancy reports were factually correct, and has never contested Dixon's authority to issue a reprimand on that basis alone.

As before, Hill does not contend that Dixon acted with a discriminatory animus when he made the decision that the third reprimand was warranted. Hill has presented no evidence and has made no claim that similarly situated employees were not issued discrepancy reports for the same or similar deficiencies in their work performance, or that they were not issued written reprimands once such discrepancy reports were verified by the lead person. On the contrary, Hill testified that Fultz had written "many discrepanc[y]" reports for faulty work completed by other mechanics at the Fort Drum worksite during their assignment there, at least one of which resulted in the suspension of a male employee, J.A. 95, and Hill's supervisor at Fort Bragg had issued her first reprimand based upon a single discrepancy report by the safety inspector there. Rather, Hill asserts that the discrepancy reports issued by Fultz, although accurate, were "nit-picky and trivial," J.A. 83, and that, because they were issued during the same time period that Fultz was uttering discriminatory statements that she had complained about to Dixon, a jury could find that she received the reprimand "because of" her sex and age.

Even if we accept the proffered inference that Fultz was motivated by discriminatory and retaliatory animus towards Hill to issue the discrepancy reports, this fact does not transform Fultz into the actual decisionmaker or the one principally responsible for Dixon's decision to issue the third reprimand. Rather, it is undisputed that Dixon personally investigated and verified the accuracy of the discrepancy reports, and made an independent, non-biased decision, again in con-

sultation with Griffin, that the infractions were sufficiently serious to warrant not only a written reprimand, but the third reprimand that would trigger Hill's termination.

Hill's argument that Fultz was the actual decisionmaker because Dixon allegedly told Hill that he had no power to override Fultz's actions under the SOP is also unavailing. Accepting Dixon's alleged statement to Hill as true and viewing it in the light most favorable to her, it only provides evidence that Dixon was not authorized to arbitrarily override a *legitimate and accurate* discrepancy report issued by a Lockheed safety inspector charging an aircraft mechanic with improper completion of an aircraft modification work order. It does not alter Dixon's ability to evaluate, and to verify or reject, discrepancy reports when deciding whether disciplinary action is warranted under Lockheed's SOP.

Nor would it be appropriate to withhold summary judgment from an employer who has terminated an employee for rules violations, and wholly in the absence of any discriminatory motivation on the part of the decisionmakers, simply because the violations might not have been known in the absence of a subordinate's discriminatory animus that brought the infractions to light. Otherwise, an unbiased employer could never discipline or terminate an employee for an undisputed violation of company rules, including such egregious acts as fighting or stealing (or endangering the lives of those who fly on aircraft carelessly attended by a mechanic), so long as the employee could demonstrate that she was "turned in" by a subordinate employee "because of" a discriminatory motivation.

### D.   The Termination

This brings us to Lockheed's decision to terminate Hill because she had accumulated the three predicate reprimands for termination under SOP 3.4.2. The decision rested formally with Tom Prickett, Lockheed's program manager in charge of the contract field teams, and Archie Griffin, the senior site supervisor for Lockheed's East Coast jobsites, both of whom were located at sites away from Fort Drum. For the reasons that follow, we are satisfied that they were also the actual decisionmakers.

After Dixon determined that a third reprimand was warranted for Hill's unsatisfactory work performance, he sent Hill home to await word on her status. Dixon then contacted Griffin for guidance on how to proceed and, upon being told by Griffin to follow Lockheed's SOP, forwarded the disciplinary paperwork to him. At the time, Griffin had before him Hill's first reprimand for her violation of Rule 4 of the SOP — unsatisfactory quality of work — issued by Ronald Souders at Fort Bragg in September 1997; Hill's second reprimand for her violation of Lockheed's tool control policy issued by Dixon at Fort Drum in April 1998; and Hill's third reprimand for her second violation of Rule 4 of the SOP — unsatisfactory quality of work — issued by Dixon in May 1998. But the information Griffin possessed was not limited to these admitted work performance problems. Griffin was also personally aware of the dissatisfaction Hill had engendered on jobsites prior to Fort Drum. Specifically, Griffin testified that, although most of the people liked Hill as a person, none of his lead men wanted her to be assigned to them because of the quality of her work and because she had to have continuous guidance. He had personally spoken with Hill prior to sending her to Fort Drum about these complaints and advised her that her work was not up to par. Moreover, Griffin had already had several conversations with Dixon concerning Hill's work problems at Fort Drum.

Nevertheless, after Griffin was notified of the events warranting a third reprimand and termination under the SOP, he consulted with both Dixon and Fultz concerning Hill's termination and confirmed that Dixon had talked to Hill about her situation at Fort Drum. Although Dixon declined to specifically recommend to Griffin that Hill be terminated from her employment, Dixon testified that he "felt like [Hill] couldn't do the job anymore" and "that's what I told the boss, and he said put the paperwork in." J.A. 150. Dixon testified that Hill "could do one job today normal. Tomorrow she would mess it up, and . . . you'd tell her that she messed this up and then she'd correct it. . . . This airplane may be fine. The next one may be off." J.A. 146. In other words, Dixon testified, he needed another sheet metal mechanic on his job. Fultz was also critical of Hill's work performance and was asked by Griffin to work with Dixon to prepare a written report documenting "all the details of what happened." J.A. 255. Fultz wrote the report and gave it to Dixon, who ultimately forwarded it to Griffin. Prickett, the program manager, testified that his

decision to terminate Hill pursuant to Lockheed's SOP was based on the information provided to him by Griffin and Dixon.

In sum, although Fultz was in a position to report Hill's safety and work quality violations to Dixon, and ultimately to Griffin, the shards of evidence put together by Hill regarding Fultz's involvement in her termination are insufficient to support a finding that Fultz was the actual decisionmaker, or the one principally responsible for Lockheed's decision to terminate her. By bringing Hill's shortcomings to light, Fultz merely initiated the decisionmaking process that led to the final two reprimands issued by Dixon and the termination decision. By Hill's own account of the events leading up to her termination, it was Dixon, the lead person and Hill's direct supervisor, who was principally responsible for the final two reprimands after he made independent, non-biased determinations that they were appropriate under Lockheed's procedures. And, it was Griffin, with the approval of Prickett, who made the independent, non-biased decision to terminate Hill after having been advised of Hill's performance problems prior to her going to Fort Drum and receiving documentation of the three reprimands and word from her on-site supervisor that Hill's work quality problems had continued there. The mere fact that Fultz's opinion was solicited by Griffin during the course of the decisionmaking process is insufficient to change the undisputed fact that Griffin reached an independent, non-biased decision to terminate Hill.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Lockheed as to Hill's sex and age discrimination claims brought under Title VII, the ADEA, and the New York Human Rights Act. Hill has failed to demonstrate by legally sufficient direct or circumstantial evidence that her sex or age was "a motivating factor" for her termination by Lockheed, *see* 42 U.S.C.A. § 2000e-2(m), because she has failed to demonstrate that any relevant decisionmaker at Lockheed harbored such a discriminatory motivation. Fultz possessed no supervisory or disciplinary authority over Hill and the record does not support a conclusion that Fultz was the actual decisionmaker or was otherwise principally responsible for the termination decision.

Hill likewise has failed to establish her termination claim under the burden-shifting framework of *Burdine* and *McDonnell Douglas*. As

an initial premise, Hill has failed to establish a prima facie case of sex or age discrimination because, by her own admissions of the work performance and rules infractions that led to her termination, she has failed to demonstrate that she was performing her job duties at a level that met Lockheed's legitimate expectations at the time of the adverse employment action. However, even if it could be said that a prima facie case had been stated, Hill could not prevail because Lockheed articulated a legitimate, nondiscriminatory reason for the termination decision, and Hill has come forward with no evidence to demonstrate that the reason proffered by Lockheed was a pretext for discrimination on the part of its relevant decisionmakers.

VI.

For similar reasons, Hill's claim that she was terminated by Lockheed in retaliation for her complaints to Dixon about Fultz's discriminatory remarks also fails. Section 704(a) of Title VII provides that:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter.

42 U.S.C.A. § 2000e-3(a). To establish a prima facie case of retaliation, the employee must show (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal connection between the protected activity and the adverse employment action. *See King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003).

In this case, Hill's asserted "protected activity" was comprised of complaints of discrimination that she allegedly made to her supervisor, Dixon, about Fultz's discriminatory comments towards her. However, Hill has failed to establish a prima facie case of retaliation because she cannot demonstrate that Lockheed's decision to terminate her was caused by the complaints she made to Dixon.

First, even if we assume that Hill complained to Dixon about Fultz's age and sex comments,[7] Hill does not claim that Dixon issued

---

[7]While Hill testified that she complained to Dixon about Fultz's age and sex comments, Dixon testified that Hill only complained that Fultz was picking on her and yelling at her.

her the second or third reprimand in retaliation for her complaints against Fultz. Nor does Hill claim that Griffin or Prickett made their decision to terminate her for retaliatory reasons. Rather, as is the case with her discrimination claims, Hill asserts that she may prevail on her retaliation claim because, after she returned from the suspension imposed upon her for her second reprimand, Fultz retaliated against her for complaining to Dixon by issuing six discrepancy records for unsatisfactory MWOs that had been signed by Hill as completed. This evidence is similarly insufficient to establish a retaliation claim because Fultz held no disciplinary authority and was neither an actual decisionmaker nor otherwise principally responsible for Dixon's decision to issue the third reprimand which triggered the termination decision. As noted previously, Dixon personally reviewed every alleged deficiency reported by Fultz and verified each one before relying upon it as a basis for his decision, as Hill's immediate supervisor and the lead person on the site, to issue the reprimand. There is no claim that Dixon issued any reprimand in retaliation for Hill's complaints, and no claim that Griffin or Prickett acted in retaliation. There is no claim that similar infractions were overlooked by Dixon when it came to other employees or, for that matter, that similar infractions were overlooked by Fultz when committed by Hill's co-workers. Indeed, the only evidence is to the contrary. And, Hill admitted that she committed all but one of the errors contained in the discrepancy reports and acknowledged her belief that she would have been terminated even if she had not complained to Dixon.[8] Accordingly, we also

---

[8] Q: Was [Fultz] mad at you because you had complained to Mr. Dixon?

A: That, I don't know. That was my assumption on that.

Q: But you don't have any evidence to support that?

A: No.

Q: Do you think you would have been terminated if you had *not* complained to Mr. Dixon?

A: Oh, yeah.

Q: Do you think you would have been terminated either way?

A: Yeah.

J.A. 106.

affirm the district court's determination that Lockheed was entitled to summary judgment on Hill's claim of retaliation.

## VII.

For the foregoing reasons, the decision of the district court granting summary judgment to Lockheed is hereby affirmed.

*AFFIRMED*

MICHAEL, Circuit Judge, dissenting:

I respectfully dissent. A major purpose of Title VII and the ADEA is to outlaw discriminatory employment decisions that are made because of sex or age. Biased subordinates without decisionmaking authority often influence these decisions. Yet the majority holds that when a biased subordinate with no decisionmaking authority exercises substantial influence over an employment decision, the subordinate's bias cannot be imputed to the formal decisionmaker who acts for the employer. *See ante* at 16. This puts us at odds with virtually every other circuit, and it puts us at odds with the language of the statutes, which impose liability when an adverse employment decision is taken "because of" sex or age discrimination, *see* 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1). After today in this circuit, an employer is off the hook for a discriminatory employment decision that is motivated by the bias of a subordinate who lacks decisionmaking authority. That is wrong. As for the facts in this case, the majority fails to state them in the light most favorable to the plaintiff, Ethel (Lou) Hill, who was the nonmovant in the summary judgment proceedings; it especially fails to draw all justifiable inferences in Hill's favor. As a result, the majority errs in affirming the award of summary judgment to Lockheed, the employer.

## I.

A detailed account of the facts, stated in Hill's favor, appears in the panel opinion, *Hill v. Lockheed Martin Logistics Management, Inc.*, 314 F.3d 657, 660-62 (4th Cir. 2003), *vacated by en banc order*, February 12, 2003. A somewhat abbreviated version of those facts fol-

lows. Lou Hill, who is an experienced sheet metal mechanic, was almost fifty-eight years old when Lockheed sacked her in 1998. By that time Hill had worked her trade in the aircraft industry for nearly twenty-five years, the last eleven with Lockheed. At Lockheed, Hill was assigned to field teams that went to U.S. military bases to do modification work on military airplanes. Hill was working on a Lockheed job at Fort Drum, New York, when she was fired in May 1998. Hill ran into trouble on this job after Edward Fultz became her safety inspector in February 1998. Fultz did not like to have women working under him, and Hill was the only woman (and the oldest employee) on her eight-person crew. Fultz targeted Hill immediately, and during the three months in 1998 when Fultz was Hill's inspector, he made many derogatory remarks about her sex and age. On several occasions Fultz referred to her as a "useless old lady." J.A. 240A. One time he said that Hill was a useless old lady who needed to go home and retire. Another time Fultz said that Hill was "useless and they need-[ed] to retire her." J.A. 240B. He also called her a "damn woman," J.A. 241A, and "a troubled old lady," J.A. 245. Hill complained several times to her supervisor, Richard Dixon, about Fultz's harassment, but Dixon did nothing to stop it. Fultz was thus free to act on his bias against Hill by orchestrating disciplinary actions against her that made her eligible for termination. Once Hill's job was in jeopardy, formal Lockheed decisionmakers fired her based on Fultz's negative assessment of her work.

Fultz's first move was to manipulate Dixon into reprimanding Hill for violating Lockheed's tool control policy. Under this policy an employee must keep track of her tools and report missing tools to her supervisor. Hill had three identical pairs of four-inch cutters, and an Army employee found a pair of Hill's cutters on a maintenance stand on April 14, 1998. The Army employee took the cutters to Fultz, who then gave them to Dixon. Fultz told Dixon that he had checked Hill's toolbox at the end of Hill's shift and asked her where her extra cutters were. According to Fultz, Hill replied, "I told Richard [Dixon] I took [them] home." J.A. 145. Hill insists that she did not have any discussion with Fultz about her cutters and that Fultz lied to Dixon. Indeed, Hill did not even know that a pair of her cutters were missing, so she had no occasion to claim that she had talked to Dixon about missing cutters. Hill was therefore surprised when Dixon showed her a pair of cutters and asked if they were hers. Believing that all of her cutters

were accounted for, Hill simply replied that the cutters had her number on them. This answer did not satisfy Dixon because he mistakenly believed — based on Fultz's false report — that Hill already knew for sure that her cutters were missing. Dixon also believed that Hill had lied to Fultz by telling him that she had talked to Dixon about her missing cutters. (Dixon did not tell Hill about Fultz's report to him, so Hill had no opportunity to point out that Fultz was lying.) Because Fultz's false report led Dixon to conclude that Hill had lied, Dixon gave Hill a written reprimand and a three-day suspension.

After Hill returned from her three-day suspension at the end of April 1998, she complained again to Dixon that Fultz was discriminating against her. Dixon mentioned to Fultz that Hill had registered a complaint, and Fultz reacted with noticeable anger towards Hill. Fultz immediately began to write discrepancy reports (reports documenting worker error) on Hill, writing six reports in the next three workdays. Fultz marked each of the errors as "minor," and Hill said they were "nit-picky and trivial." J.A. 83. Fultz, as safety inspector, had the discretion on whether or not to write up minor mistakes. Dixon, as supervisor, had no control over whether a discrepancy report was written. Dixon could, however, check a report for accuracy, and he refused to endorse one of the reports that Fultz issued against Hill. Dixon said that Hill's minor work errors during her tenure at Ft. Drum were never serious enough for him to engage in formal counseling with her.

Nevertheless, Hill was handed another written reprimand on May 4, 1998, as a result of the flurry of discrepancy reports Fultz had issued against her during the three workdays at the end of April and the beginning of May 1998. This last reprimand was Hill's third in twelve months (one had carried over from another job), and she was now subject to discharge. Within days she was fired. The formal decision to fire Hill was made by two Lockheed officials, Archie Griffin and Thomas Prickett, neither of whom was located at Fort Drum. According to Griffin, the decision to fire Hill was based entirely on information provided by Fultz and Dixon, especially Fultz. Griffin talked with Fultz about Hill several times prior to the termination decision, and Fultz provided Griffin with a written statement of his observations about Hill's work performance. Neither Griffin nor Prickett talked with Hill while she was being considered for termination,

and neither official had any firsthand knowledge of her work at Fort Drum. (It was a violation of Lockheed policy not to give Hill the opportunity to present her side of the story before she was fired.) Dixon, Hill's supervisor, did not make any recommendation to Griffin or Prickett about whether Hill should be fired. On the other hand, Griffin and Prickett relied on Fultz to write and sign Hill's termination statement, a document explaining that Hill was fired because Fultz found her work to be unsatisfactory. After Hill was fired, her work was initially assigned to a thirty-one-year-old man, and she was ultimately replaced by a man who was forty-seven.

## II.

The majority renders Title VII and the ADEA essentially toothless when it comes to protecting employees against unlawful employment decisions that are motivated by biased subordinates. The majority holds that an "employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with [proof] that the subordinate employee *possessed such authority* as to be viewed as the one principally responsible for the [adverse] decision or the actual decision-maker for the employer." *Ante* at 17 (emphasis added). This proof makes the employer liable, the majority says, because such a subordinate "act[s] in a supervisory or managerial capacity as the agent[ ] of the employer." *Ante* at 14. "It is [this] individual[ ]," the majority emphasizes, "who must possess the requisite discriminatory motivation behind the adverse employment decision that [he] make[s] or for which [he] hold[s] principal responsibility." *Ante* at 14. This holding is unduly narrow. It authorizes discriminatory employment decisions that are motivated by biased subordinates who do not act in a supervisory or managerial capacity. The majority goes astray, I respectfully suggest, because it bases its holding on principles of agency law that do not get to the real issue in this case, and it overlooks the statutory focus on causation, that is, whether an adverse employment action was taken "because of" a protected trait such as sex or age. Moreover, the majority's restrictive approach for determining whether a subordinate's discrimination should be counted is out of step with the law in other circuits, and it lacks support from the Supreme Court.

The majority argues that *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), dictates the principle that an employer cannot be

held vicariously liable for an employment decision motivated by a biased subordinate unless the subordinate "act[s] in a supervisory or managerial capacity as the agent[ ] of the employer." *Ante* at 14. *Ellerth* does not dictate any such rule. *Ellerth* is bottomed on the unremarkable fact that corporations and other institutional employers act through agents. The decision recognizes that the agency relationship triggers vicarious liability for the employer when its supervisor, or some other person acting with authority, takes a tangible employment action (discharge, for example) against an employee. *Ellerth*, 524 U.S. at 760-62. The agency relationship extends liability to the employer even when the supervisor or other agent takes tangible employment action for discriminatory reasons. *Id.* As Judge Posner puts it in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990): "a supervisory employee who fires a subordinate is doing the kind of thing that he is authorized to do, and [doing it with] wrongful intent . . . does not carry his behavior so far beyond the orbit of his responsibilities as to excuse the employer." The Supreme Court in *Ellerth* sums it up in about the same way: "When a supervisor makes a tangible [and adverse] employment decision, there is assurance that the injury could not have been inflicted absent the agency relation." *Ellerth*, 524 U.S. 742. *Ellerth* simply tells us that when a supervisor or other decisionmaker fires an employee for whatever reason, we automatically have an agent whose personnel action is imputed to the employer. That does not answer today's question: when a biased subordinate who lacks decisionmaking authority substantially influences an employment decision, may his bias be imputed to the formal decisionmaker who acts for the employer. I would hold that it can be.

The basis for imputing the influential subordinate's discriminatory motive to the formal decisionmaker is rooted in the words of Title VII and the ADEA. The statutes make it unlawful "for an employer . . . to discharge . . . or otherwise to discriminate against any individual . . . because of such individual's" sex or age. 42 U.S.C. § 2000e-2(a)(1) (outlawing sex discrimination in employment); 29 U.S.C. § 623(a)(1) (outlawing age discrimination in employment). The statutes hinge employer liability on causation, that is, whether the adverse employment action was taken "because of" sex or age. When the sex- or age-based bias of the subordinate has a substantial or determinative influence on a formal decisionmaker's adverse employment action, the causation (or liability) requirement is satisfied. The employer is

liable for the discriminatory action because the subordinate's bias is imputed to the formal decisionmaker who acted for the employer. This approach has had support in the circuits for a long time.

The leading case for this approach is *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990) (Posner, J.). The *Shager* plaintiff, a fifty-year-old seed salesman, claimed that he was fired in violation of the ADEA because his supervisor was hostile to older workers. The supervisor did not personally fire the plaintiff; rather, a committee, unbiased and unaware of the supervisor's prejudice, fired the plaintiff on the recommendation of the supervisor. In analyzing whether the supervisor's motives could be imputed to the employer, the court looked to whether "the committee's decision to fire [the plaintiff] was tainted by [the supervisor's] prejudice." *Id.* at 405. The record established that the supervisor "not only set up [the plaintiff] to fail by assigning him an unpromising [sales] territory but influenced the committee's deliberations by portraying [the plaintiff's] performance to the committee in the worst possible light." *Id.* at 405. Because the committee "acted as the conduit of [the supervisor's] prejudice," his prejudice could be imputed to the employer for liability purposes. *Id.* A later Seventh Circuit case, *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394 (7th Cir. 1997) (Posner, J.), likewise discussed what happens in a Title VII case when "the discriminatory motive of [a subordinate employee], not the autonomous judgment of the non-discriminating decision-maker, is the *real cause* of the adverse employment action." *Id.* at 1400 (emphasis added). The answer is clear: "the prejudices of [the subordinate] are imputed to the employee who has formal authority over the plaintiff's job." *Id.* The *Shager* and *Wallace* opinions were nevertheless careful to point out that the subordinate's bias will not be imputed to a formal decision-maker who acts for reasons that are untainted by discrimination. *See Shager*, 913 F.2d at 405; *Wallace*, 103 F.3d at 1400.

Most other circuits, in either mixed-motive or pretext cases, have held that when the discriminatory bias of a subordinate influences an employment decision, the employer will be charged with the subordinate's bias. *See, e.g.*, *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."); *Santiago-Ramos v. Centennial P.R. Wire-*

*less Corp.*, 217 F.3d 46, 55 (1st Cir. 2000) ("One method [of proving pretext] is to show that discriminatory comments were made by . . . those in a position to influence the decisionmaker."); *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (discriminatory comments of plaintiff's supervisor, who did not have formal firing authority but who "had enormous influence in the decision-making process," constitute direct evidence of discrimination); *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001) (internal quotations and citation omitted) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate . . . [because] an evaluation at any level, if based on discrimination, [may] influence[ ] the decisionmaking process and thus allow[ ] discrimination to infect the ultimate decision."); *Russell v. McKinnsey Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) ("If the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker."); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998) ("[R]emarks by those who did not independently have the authority . . . to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant."); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir. 1994) (internal quotation marks omitted) (discriminatory remarks of a manager, who was the fired plaintiff's supervisor and who was "closely involved in employment decisions," constitute direct evidence of discrimination); *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001) (manager's comment was direct evidence of retaliation because "[e]ven if [the] manager was not the ultimate decisionmaker [in denying the plaintiff a promotion], that manager's retaliatory motive may be imputed to the company if the manager was involved in the . . . decision").

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), an ADEA pretext case cited by the majority, supports the approach of imputing to the employer the biased motives of a subordinate who substantially influences an employment decision. The Supreme Court in *Reeves* begins by focusing on the importance of causation in employment discrimination cases: "liability depends on whether the protected trait (under the ADEA, age) . . . actually played

a role in [the employer's decisionmaking] process and had a determinative influence on the [adverse decision]." 530 U.S. at 141 (quotation marks and citations omitted; first alteration in original). *Reeves* thus assumes that the formal employment decision will be made by someone in authority, that is, an agent of the employer. What matters for liability purposes is whether bias against a protected trait — including bias from a subordinate — had a "determinative influence" on the decision. *See id.*

The majority is frank in explaining that its holding removes an entire class of discrimination cases from the protection of Title VII and the ADEA. It rejects the approach of a number of other circuits by refusing to "embrac[e] a test that would impute the discriminatory motivations of subordinate employees having no decisionmaking authority to the employer . . . simply because they have influence or even substantial influence in effecting a challenged decision." *Ante* at 16-17. By only counting the discriminatory motivation of someone who "act[s] in a supervisory or managerial capacity as the agent[ ] of the employer," *ante* at 14, the majority improperly narrows the scope of Title VII and the ADEA. Under the majority's standard, unlawful discrimination will go unaddressed in many cases where a subordinate's discriminatory bias taints the employment decision. To prevent this from happening, our circuit should hold that when a biased subordinate has substantial influence on an employment decision, the subordinate's bias will be imputed to the formal decisionmaker. This, of course, means that the subordinate's bias should not be imputed if the formal decisionmaker conducts an independent investigation and exercises independent judgment that is free of discrimination.

III.

The summary judgment record, taken in the light most favorable to Hill, establishes the following. Fultz, Lockheed's safety inspector at Ft. Drum, regularly made discriminatory comments on the job about Hill's sex and age, calling her a "useless old lady" whom the company "need[ed] to retire." J.A. 240A, 240B. Fultz's discriminatory attitude was also reflected in actions that Fultz took or orchestrated against Hill. Fultz's discriminatory animus towards Hill may be imputed to Griffin and Prickett, the two formal decisionmakers (or company

agents), because Fultz had a substantial influence on the decision to fire Hill.

To begin with, Fultz, as safety inspector, had considerable say in the evaluation of Hill's performance. Fultz inspected all of Hill's work, and Fultz alone had the authority to issue discrepancy reports that documented worker error. Using his position, Fultz took a series of steps that set up Hill to be fired. First, Fultz manipulated Hill's supervisor, Dixon, into believing that Hill had lied about her missing cutters. This led Dixon to issue the second reprimand (with a three-day suspension) to Hill. Second, when Hill returned to work from her suspension, she complained to Dixon that Fultz was discriminating against her. Fultz became quite angry when he learned of Hill's complaint, and he wasted no time in taking it out on her. Fultz quickly issued six discrepancy reports against Hill, all for minor or trivial mistakes. These discrepancy reports led to Hill's third reprimand, and the three reprimands made Hill eligible for discharge. Third, once discharge was under consideration, Fultz provided Griffin with a written statement that detailed Fultz's observations about Hill's work performance. Fultz portrayed Hill's performance in the worst possible light, and Hill was fired in due course.

Griffin and Prickett, the formal decisionmakers for Lockheed, did not exercise independent judgment in making the termination decision. Griffin and Prickett, who were not located at Ft. Drum, did not observe Hill's work, nor did they give her the chance to state her case against discharge. They relied entirely on information provided by Fultz and Dixon, but especially Fultz. Dixon simply submitted Hill's file without a recommendation. Griffin talked with Fultz several times prior to the termination decision, and in the end, Griffin and Prickett relied on Fultz to write and sign Hill's termination statement. The termination statement explained that Hill was being fired because Fultz found her performance to be unsatisfactory. Fultz mainly relied on the grounds for the reprimands that he had orchestrated against Hill. The summary judgment record allows the inference that Fultz orchestrated those reprimands because of his animus towards Hill. Because Griffin and Prickett relied on tainted information from Fultz in reaching the decision to fire Hill, Fultz's discriminatory animus may be imputed to them. (The record also provides ample grounds for labeling Fultz as an actual decisionmaker, which is an alternative basis for imputing

his discrimination to the company. *See* part II.A.2.c of the vacated panel opinion, *Hill v. Lockheed Martin Logistics Management, Inc.*, 314 F.3d at 671-73. I do not press this point today, however.)

## IV.

The vacated panel opinion (parts II.B, II.C, and III) considers each of Hill's claims under Title VII and the ADEA — that she was fired because of her sex and age and that she was also fired because of her complaints of discrimination. For the reasons stated in the panel opinion, Lockheed's motion for summary judgment on these claims should be denied. *See Hill v. Lockheed Martin Logistics Management, Inc.*, 314 F.3d at 673-80. Hill's evidence entitles her to a trial, and we ought to give her one.

Judge Motz, Judge King, and Judge Gregory join in this dissent.