# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3496

TRACEY LUST,

Plaintiff-Appellee,

v.

SEALY, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02-C–50—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED MARCH 31, 2004—DECIDED SEPTEMBER 7, 2004

_____


Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* Tracey Lust sued her employer, Sealy, the mattress manufacturer, for sex discrimination in violation of Title VII. A jury returned a verdict in her favor, awarding her $100,000 in compensatory damages and $1 million in punitive damages. Pursuant to 42 U.S.C. § 1981a(b)(3)(D), which places a ceiling of $300,000 on the total damages that may be awarded in an employment discrimination case against the largest employers (a category that includes Sealy), *White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, 806 (6th Cir. 2004), the judge reduced the

total damages award to $300,000, to which she added $1,500 in back pay (which is not within the statutory meaning of "damages," 42 U.S.C. § 1981a(b)(2)).

Sealy attacks the judgment on a variety of grounds, not all of which require discussion given the very full opinion by the district judge turning down Sealy's motion for reconsideration. The ground it presses hardest is that no reasonable jury could have found sex discrimination. But this misunderstands the function of appellate review of a jury verdict by treating as gospel self-serving testimony by Sealy managers (riven with inconsistencies, by the way) that the jury was free to disbelieve. Sealy's contention that "the jury cannot be permitted to simply choose to disbelieve the evidence offered by Sealy" is a misleading half-truth. It is true that a plaintiff cannot prevail without offering any evidence of his own, simply by parading the defendant's witnesses before the jury and asking it to disbelieve them. That would be "a no-evidence case, and [in] such a case a plaintiff must lose, because he has the burden of proof." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002), quoting *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746–47 (7th Cir. 1994); see also *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 655 (7th Cir. 2002). But if the plaintiff offers evidence of her own, as she did here, the jury is free to disbelieve the defendant's contrary evidence. There is no presumption that witnesses are truthful.

Lust was a sales representative who has been employed in Sealy's Madison, Wisconsin office since 1992. Her supervisor, Scott Penters, regarded her highly. In 2000 an opportunity opened up for promotion to "Key Account Manager" in Chicago, the key account being a mattress retailer called Bedding Experts. The appointment would have represented a significant promotion for Lust, who had repeatedly expressed to Penters her avid desire to become a Key Account Manager.

Instead the job went to a young man. Two months later, after Lust filed her discrimination claim with the EEOC, Sealy offered her and she accepted a Key Account Manager's position in the Madison office. It is because of the short delay in her obtaining the promotion that the award of back pay was so small.

The jury's finding that Lust was passed over because of being a woman cannot be said to be unreasonable, which, as Sealy fails to acknowledge, is the standard of appellate review of jury findings. Fed. R. of Civ. P. 50(a)(1); *Reynolds v. City of Chicago*, 296 F.3d 524, 526–27 (7th Cir. 2002); *Hunt v. Nebraska Public Power District*, 282 F.3d 1021, 1029 (8th Cir. 2002); *Swanks v. Washington Metropolitan Area Transit Authority*, 179 F.3d 929, 935 (D.C. Cir. 1999). Penters had a history of making sexist remarks to Lust, such as "oh, isn't that just like a woman to say something like that," or "you're being a blond[e] again today," or "it's a blond[e] thing." (Lust is blonde; Sealy points out irrelevantly that blondes are not a statutorily protected class, which will disappoint hair colorists.) More important, once when she expressed an interest in a promotion even though she had just gotten married, Penters was surprised and asked her "why Jerry [her husband] wasn't going to take care of" her.

Most important, Penters admitted that he didn't consider recommending Lust for the Chicago position because she had children and he didn't think she'd want to relocate her family, though she hadn't told him that. On the contrary, she had told him again and again how much she wanted to be promoted, even though there was no indication that a Key Account Manager's position would open up any time soon in Madison. Realism requires acknowledgment that the average mother is more sensitive than the average father to the possibly disruptive effect on children of moving to another city, but the antidiscrimination laws entitle individuals to be

evaluated as individuals rather than as members of groups having certain average characteristics. *City of Los Angeles v. Manhart*, 435 U.S. 702, 707-11 (1978); *Peters v. Jefferson Chemical Co.*, 516 F.2d 447, 451 (5th Cir. 1975). It would have been easy enough for Penters to ask Lust whether she was willing to move to Chicago rather than assume she was not and by so assuming prevent her from obtaining a promotion that she would have snapped up had it been offered to her.

Penters, it is true, didn't decide who would be promoted to Key Account Manager; his superior, Al Boulden, did, and Boulden testified that he had passed over Lust for the Chicago position because he thought her deficient in inter-personal skills and unlikely to want to move to Chicago, given the number of "X"'s in her relocation chart (see below). If Penters had had no input into the decision to turn down Lust, his sexist attitudes would be irrelevant, for in that case they could have no causal relation to the discrimination of which she complains. E.g., *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121-22 (7th Cir. 1998). But it was Penters who recommended Lust's male competitor for the promotion, and although Boulden testified that he considered others for the position, including Lust, the jury could have inferred, from Boulden's testimony that West "was the only one Mr. Penters served up" and having received Penters' recommendation he "did not have to" interview anyone else for the position, that Boulden had given great weight to Penters' recommendation.

We are mindful that *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 286-91 (4th Cir. 2004), holds that a subordinate's influence, even substantial influence, over the supervisor's decision is not enough to impute the discriminatory motives of the subordinate to the supervisor; the supervisor must be the subordinate's "cat's paw" for such imputation to be permitted. That is not the view of this

court, even though the "cat's paw" formula apparently originated in our decision in *Shager v. Upjohn Co.*, 913 F.2d 398, 404-05 (7th Cir. 1990), and has been repeated in a number of our cases. E.g., *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003); *Mateu-Anderegg v. School District of Whitefish Bay*, 304 F.3d 618, 623-24 (7th Cir. 2002); *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1100 (7th Cir. 2001). The formula was (obviously) not intended to be taken literally (Sealy employs no felines), and were it taken even semi-literally it would be inconsistent with the normal analysis of causal issues in tort litigation. If Boulden would not have turned down Lust for the promotion had it not been for Penters' recommendation, a recommendation that the jury could reasonably find was motivated by sexist attitudes, then Penters' sexism was a cause of Lust's injury, whether or not Boulden could reasonably be thought a mere cat's paw. Indeed it would make this case just like *Shager*:

> Lehnst [the ageist subordinate] did not fire Shager; the Career Path Committee did. If it did so for reasons untainted by any prejudice of Lehnst's against older workers, the causal link between that prejudice and Shager's discharge is severed, and Shager cannot maintain this suit even if Asgrow is fully liable for Lehnst's wrongdoing. But if Shager's evidence is believed, as in the present posture of the case it must be, the committee's decision to fire him was tainted by Lehnst's prejudice. Lehnst not only set up Shager to fail by assigning him an unpromising territory but influenced the committee's deliberations by portraying Shager's performance to the committee in the worst possible light. Lehnst's influence may well have been decisive. The committee's deliberations on the question whether to fire Shager were brief, perhaps perfunctory; no member who was deposed could remember having considered the issue. A committee of this sort, even if it is not just a liability shield

> invented by lawyers, is apt to defer to the judgment of the man on the spot. Lehnst was the district manager; he presented plausible evidence that one of his sales representatives should be discharged; the committee was not conversant with the possible age animus that may have motivated Lehnst's recommendation.

913 F.2d at 405 (citation omitted).

And in *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754 (7th Cir. 2000), for example, quoting our earlier decision in *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997), we said that "the prejudices of an employee, normally a subordinate but here a coequal, are imputed to the employee who has formal authority over the plaintiff's job . . . where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision." See also *Hoffman v. MCA, Inc.*, *supra*, 144 F.3d at 1121-22 ("tainted the decision maker's judgment"); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) ("able to manipulate the decisionmaking process and to influence the decision"); *Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 84-88 (1st Cir. 2004); *Laxton v. Gap Inc.*, 333 F.3d 572, 584-85 (5th Cir. 2003); *Abramson v. William Paterson College*, 260 F.3d 265, 285-86 (3d Cir. 2001); *Griffin v. Washington Convention Center*, 142 F.3d 1308, 1311-12 (D.C. Cir. 1998).

In any event, the purity of Boulden's own motives was placed in issue, though perhaps not very convincingly. Since inability to get along with customers couldn't have been cured immediately, the speed with which Boulden re-classified an account as a key account in order to make Lust a Key Account Manager when she accused the company of sex discrimination and seemed (and in fact was) about to sue might seem powerful evidence that Boulden didn't

really think that Lust lacked good interpersonal skills. It's actually weak evidence because the promotion may have been motivated by a desire, which would have been consistent with continued doubts about Lust's suitability for promotion, to head off a lawsuit or mitigate the amount of back pay and damages that might be awarded.

Worse, the evidence violated the spirit, and probably the letter, of Rule 407 of the Federal Rules of Evidence. *Dennis v. County of Fairfax*, 55 F.3d 151, 153-56 (4th Cir. 1995). The rule forbids using evidence of subsequent repairs or other remedial measures to prove that the defendant could or should have avoided inflicting the injury of which the plaintiff is complaining. The reason behind the rule is that allowing such evidence to be used for such a purpose would discourage the taking of remedial measures. E.g., *Probus v. K-Mart, Inc.*, 794 F.2d 1207, 1210 (7th Cir. 1986). The reason seems applicable here (and there is no basis in the language or rationale of the rule for confining it to nonintentional torts, though they are the usual occasion for its invocation), but Sealy has not invoked Rule 407 and any objection to the evidence based on that rule is therefore waived. As we'll see, Sealy actually tries to use the evidence to bolster its case, which may be why it didn't object, although it could have sought a limiting instruction.

We attach no weight to Sealy's statement in closing argument that "Sealy rectified and corrected . . . the decision that you found on the failure to promote her immediately, because it responded immediately, as soon as it learned of her distress over not having been promoted." This was not an admission of liability, but an attempt to mitigate damages after the jury had found liability. Lust could and did use the quick promotion to impeach Boulden's testimony about her inadequate interpersonal skills. But the jury was not instructed that it could consider the evidence of the promotion for that limited purpose only.

Sealy presented evidence intended to persuade the jury that Lust had been passed over for the Chicago position for innocent reasons. Some of the evidence was so weak that it probably strengthened Lust's case by making Penters and Boulden look like liars. Sealy's sales representatives are asked to fill out a chart that lists the company's 21 sales districts, and to indicate which of these are their first, second, or third choices ("A," "B," or "C") for being relocated to and which are out of the question ("X"). Lust marked "Chicago/Wisconsin District" with an "A" and Sealy argues that since she was already in that district, her marking it with an "A" shows that she didn't want to move from Madison to Chicago. That is a non sequitur. What is true is that even if a sales rep didn't want to move from Madison to Chicago, she wouldn't mark "Chicago/Wisconsin District" with an "X," as that would suggest she wanted to leave the district. But one couldn't infer from her marking "A" that she was determined to remain in Madison. Lust indicated a willingness to relocate to three districts that are much farther from Madison than Chicago is—Arizona ("A"), Florida ("B"), and California ("C"). How her chart could have been interpreted to signify unwillingness to move 148 miles to Chicago baffles us, as it doubtless did the jury and may have been enough to convince it that Penters and Boulden were testifying untruthfully.

Sealy thinks it telling that when Boulden finally offered Lust a promotion to Key Account Manager, he gave her a choice between Madison and Chicago and she chose Madison. Of course, other things being equal, she preferred not to uproot her family, which included children as well as her husband. But it doesn't follow that she wouldn't have taken the Chicago position had there been no opening in Madison. She can hardly have been wedded to Madison when her first choice for relocation, family and all, was Arizona.

Another boomerang argument by Sealy is that the staff at Bedding Experts—the key account that Lust would have managed had she been given the Chicago position—consisted of foul-mouthed animals. There had been an incident several years earlier, with a different account, at which Lust's effort to divert a customer from talking about his sexual activities with his ex-wife and about the strip bar that he owned so enraged the customer that he rolled up the agenda of their meeting and threw it at her, whereupon she left and the account was given to another sales rep, a man. One possible inference is that Lust is too prissy for Sealy's roughest customers. But another is that Sealy merely assumes that women can't deal with foul-talking men; and that is an impermissible assumption, another example of stereotypical thinking. No doubt more women than men would have trouble bonding with macho mattress dealers, but there are tough women (women now fly combat missions for the Air Force), and maybe Lust, who is at least brave enough to go by her husband's last name, is one of them, notwithstanding the incident with the strip-bar owner—and his behavior was so egregious that it is merely a conjecture that a male Sealy rep could have pacified him, or that Lust's male successor on the account did so. Penters or Boulden could have explained to Lust the character of the Bedding Experts staff and probed her ability to handle such people. Instead they merely assumed that she could not. They would not have assumed that about a man, even a man who had walked out of a customer's office when the customer pelted him— or so at least a reasonable jury could find.

We move on to Sealy's objections to the district judge's evidentiary rulings. One is that Penters should have been allowed to explain what he meant when he said "we probably all would not be here today" had he asked Lust whether she was willing to move to Chicago. Lust's interpretation is that Penters was admitting that he was to blame

for the lawsuit, since he admitted feeling "mostly responsible" for it because her desire to be a Key Account Manager was "a deeper desire than [he had] ever realized." Sealy's complaint is that Penters' explanation of the comment—"because if Tracey and I had ever had a discussion about her wanting to move to Chicago, she would have told me no"—should not have been stricken from the evidence. The judge struck the comment (after it had been made, however, so that it is doubtful that the jury was much affected by the ruling) on the ground that it was "not really relevant." We don't see that. A district court is certainly allowed (indeed in clear cases required) to permit a witness to explain on redirect examination what he meant by his answer to a question that had been put to him on cross-examination. E.g., *United States v. Chaimson*, 760 F.2d 798, 810 (7th Cir. 1985); *United States v. Caballero*, 277 F.3d 1235, 1249-50 (10th Cir. 2002); *United States v. Braidlow*, 806 F.2d 781, 783-84 (8th Cir. 1986). But the explanation that Penters gave didn't make any sense, and we can't imagine that its being stricken influenced the verdict even if the jury actually managed to exclude the comment from its consideration of the evidence. A better ground for striking his explanation, however, than irrelevance would have been that he had no basis in personal knowledge for saying "she would have told me no." He had not been qualified as a mind reader.

Penters' "blonde" and "just like a woman" comments occurred too long before Lust sued to be actionable under Title VII. But she was not suing over those comments, and could not have done so regardless of when they were made, because they were too trivial to constitute sexual harassment. She was merely using them to cast light on Penters' mindset; and regarding *that* use the question is merely whether they were so stale as to lack any probative value. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 575-76 (7th Cir. 2003); *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1130-31 (8th Cir.

1999). Sealy argues that they were, but it was a judgment call for the trial judge to make.

In order to show that Penters' sexist attitudes had not influenced Sealy's decision to offer the Chicago position to a man, Boulden was asked by Sealy's lawyer whether he would have given the position to Lust had Penters recommended her for it, and an objection to his answer was sustained. (The answer would have been "no.") The judge thought the question asked for speculation. Some hypothetical questions are so framed as to be incapable of eliciting answers of even minimum reliability. *Gierlinger v. Gleason*, 160 F.3d 858, 870-71 (2d Cir. 1998); cf. *Greene v. Sullivan*, 923 F.2d 99, 102 (8th Cir. 1991). This was one. If Boulden was not himself sexist, his response to Penters' recommendation of Lust would have depended on precisely what Penters said both in making the recommendation and in responding to whatever follow-up questions Boulden asked. For Boulden to say that no matter what Penters said he would not have given Lust the job is to say that he had a closed mind—perhaps closed by sexism. So this is another example of evidence Sealy wanted to present that would probably have damaged the company in the eyes of the jury. Boulden's proffered answer was also inconsistent with his testimony that if Penters had recommended Lust, he (Boulden) "would have given her consideration. I would have taken time, I'm sure, to think it through. I would have asked Scott to explain it first. Help me understand, you know, what's your rationale, and give him a chance to sell me."

Sealy also complains about the exclusion of three memos that Boulden wrote when Lust complained to him that she was being passed over for discriminatory reasons. In the memos he said that he hadn't promoted her because of deficiencies in her interpersonal skills and—inconsistently—that he was planning to promote her soon. A memo nor-

mally is hearsay, *Bracey v. Herringa*, 466 F.2d 702, 704-05 (7th Cir. 1972); *In re Henry Holzapfel's Sons, Inc.*, 249 F.2d 861, 864 (7th Cir. 1957); *Timberlake Construction Co. v. U.S. Fidelity & Guaranty Co.*, 71 F.3d 335, 341-42 (10th Cir. 1995), being offered to prove the truth of a statement made out of court; and unlike some other forms of hearsay, the argument for excluding it from evidence unless it falls within one of the exceptions to the hearsay rule is compelling. There is no more facile a method of creating favorable evidence than writing a self-exculpatory note. Such notes have no warrants of reliability and allowing them to be placed in evidence would operate merely as a subsidy to the forest-products industry.

Even when contemporaneous with the events narrated in them, they fall outside the spontaneity exceptions in Fed. R. Evid. 803(1)-(3). The rationale for these exceptions is that spontaneous utterances, especially in emotional circumstances, are unlikely to be fabricated, because fabrication requires an opportunity for conscious reflection. *United States v. Santos*, 201 F.3d 953, 963-64 (7th Cir. 2000); *United States v. Hall*, 165 F.3d 1095, 1108-09 (7th Cir. 1999). As with much of the folk psychology of evidence, it is difficult to take this rationale entirely seriously, since people are entirely capable of spontaneous lies in emotional circumstances. "Old and new studies agree that less than one second is required to fabricate a lie." Douglas D. McFarland, "Present Sense Impressions Cannot Live in the Past," 28 *Fla. St. U. L. Rev.* 907, 916 (2001). It is time the law began paying attention to such studies. But that is a story for another day, since in any event the rationale of the spontaneity exceptions is not engaged by this case. Boulden was hardly under emotional pressure when he was writing these memos, and their length, lucidity, and self-congratulatory tone all refute any inference of spontaneity.

Sealy argues that the memos were alternatively admissible as "records of regularly conducted activities." Fed. R. Evid. 803(6). They were business records in the literal sense, or perhaps *a* literal sense, of being documents created for a business purpose—namely to create evidence of nonliability! They were not the kind of business record to which the business-records exception to the hearsay rule refers, as is apparent from the requirement that it be "the regular practice of that business activity to make" the record. Because a business depends on the accuracy of its recordkeeping, its records, although of course not sworn, are likely to be at least reasonably accurate, or at least not contrived for the purpose of making the business look better if it is sued. *United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993). Boulden's memos were not created as a part of the regular recordkeeping processes of the Sealy mattress company. Those processes include the making of personnel records, but Sealy does not contend that memos that Boulden makes of conversations with employees become part of the employee's personnel record. Their only purpose was to create evidence for use in Lust's anticipated lawsuit, and that purpose disqualifies them from admission as business records. *Echo Acceptance Corp. v. Household Retail Services, Inc.*, 267 F.3d 1068, 1091 (10th Cir. 2001); *Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d 200, 204-06 (4th Cir. 2000); *Scheerer v. Hardee's Food Systems, Inc.*, 92 F.3d 702, 706-07 (8th Cir. 1996). Boulden wasn't even "regular" in his socalled recordkeeping. He kept no notes or memos concerning prospects for the Chicago Key Account Manager's position that Lust did not get.

We move on to the remedy issues. Remember that the jury awarded Lust $100,000 in compensatory damages and $1 million in punitive damages and that the judge had to cut these amounts down to a total of $300,000. Since $100,000 is

1/11th of the total damages awarded by the jury, she allocated 1/11th, or $27,000, of the $300,000 cut-down damages award to compensation for the emotional distress that Lust claims to have experienced as a result of being passed over for the Chicago job. This computation was not an inevitable entailment of the judge's having to bring the jury's verdict within the statutory ceiling. The statute does not prescribe a method for making this adjustment and we have upheld a decision that took the entire cut out of the award of punitive damages and another that took the entire cut out of the award of compensatory damages. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 371, 376 (7th Cir. 2000); *Jonasson v. Lutheran Child & Family Services*, 115 F.3d 436, 441 (7th Cir. 1997). The former is the more common approach. See, e.g., *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1279, 1286-87 (7th Cir. 1995); *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 377-78 (1st Cir. 2004); *Hall v. Consolidated Freightways Corp.*, 337 F.3d 669, 676-77 (6th Cir. 2003). Since in a normal suit punitive damages are something added on by the jury after it determines the plaintiff's compensatory damages, probably the sensible thing for the judge to do is not to make a pro rata reduction, as here, but instead to determine the maximum reasonable award of compensatory damages, subtract that from $300,000, and denote the difference punitive damages. (All this is on the assumption, of course, that $300,000 is not an excessive award of compensatory plus punitive damages in the circumstances of the case.) But in this court Sealy does not challenge the method that the judge used; it is content to argue that $27,000 is an excessive estimate of the emotional harm caused Lust by the slightly delayed promotion.

The amount does seem high (and therefore we reject Lust's argument that if we cut the punitive-damages award, we should increase the award of compensatory damages); Boulden offered her the replacement position only two

months after she was passed over. But she testified and the jury was entitled to believe that she experienced nontrivial symptoms of anxiety and other forms of emotional distress that the belated promotion did not completely dispel (let alone retroactively). Her reactions may have been abnormal, but the tortfeasor takes his victim as he finds him (or in this case her), *Brackett v. Peters*, 11 F.3d 78, 81 (7th Cir. 1993); *Tompkins v. Cyr*, 202 F.3d 770, 780 (5th Cir. 2000); *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1294-95 (8th Cir. 1997), and the intensity of Lust's reactions may be a clue to how ambitious she is to succeed in her career. If that is the explanation, it further undermines Sealy's defense to the charge of discrimination; it is further evidence that she really did want that Chicago promotion.

The punitive damages awarded, after the judge's reduction, were $273,000, and Sealy makes several arguments for reducing them further. One, which would entail reduction to zero if we accepted it, is based on the Supreme Court's ruling in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545 (1999), that punitive damages may not be awarded in any amount against an employer in a Title VII case on the basis of discriminatory acts by its managerial employees if those acts "are contrary to the employer's 'good-faith efforts to comply with Title VII' "; see also *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 482 (7th Cir. 2003); *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459-61 (4th Cir. 2002). Sealy points to a variety of efforts that it has made to comply with the statute—including promptly promoting Lust to Key Account Manager after discovering that she believed herself to be a victim of sex discrimination. (Note the oddity that both sides wanted to use that evidence to advance their respective causes.) But unfortunately for Sealy it failed to request a jury instruction on the good-faith defense. In its reply brief it argues mysteriously that "*Kolstad* does not require that jury instructions be structured around its analytical frame-

work." Whatever that means, it doesn't excuse a party's failure to seek an instruction if it wants to present a defense to the jury. See *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 385-86 (2d Cir. 2001).

Maybe what Sealy is trying to say is that the evidence demonstrated its good faith as a matter of law, so there was no issue for the jury, but it hasn't said it clearly enough to preserve the issue for appellate review. Nor would the argument succeed if it had been preserved, since the principal evidence of good faith on which Sealy relies—namely Boulden's own testimony—the jury was free to, and doubtless did, disbelieve. So this is another example of Sealy's failure to grasp the limitations on appellate review of a jury's verdict. We do not make our own assessment of the witnesses' credibility.

Sealy argues that in any event the award of punitive damages was excessive. One reason it gives is that to award more than ten times compensatory damages offends due process. The point of the argument is obscure, since if accepted it would imply only a $3,000 reduction in the punitive damages awarded against Sealy. It is also the argument that we rejected in *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 675-78 (7th Cir. 2003), a case that involved both a smaller amount of compensatory damages and a larger amount of punitive damages, so that the ratio of punitive to compensatory damages, rather than being just a shade over 10:1 as in this case, was 37.2:1.

But there is a more fundamental objection to the argument. When Congress sets a limit, and a low one, on the total amount of damages that may be awarded, the ratio of punitive to compensatory damages in a particular award ceases to be an issue of constitutional dignity, *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1249 (10th Cir. 1999); cf. *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000), though

in particular cases it may be higher than the evidence war-rants, as we found to be the case in *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1355-56 (7th Cir. 1995), and in the *Ramsey* case cited below. Long before anyone thought the Constitution placed a limit on damages, damages awards were being set aside as excessive. On the difference between the constitutional limit and the ordinary exercise of judicial control over jury awards, see *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049-50 (8th Cir. 2002); *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1330-33 (11th Cir. 1999).

The purpose of placing a constitutional ceiling on punitive damages is to protect defendants against outlandish awards, awards that are not only irrational in themselves because out of whack with any plausible conception of the social function of punitive damages but potentially catastrophic for the defendants subjected to them and, in prospect, a means of coercing settlement. That purpose falls out of the picture when the legislature has placed a tight cap on total, includ-ing punitive, damages and the courts honor the cap.

As we emphasized in *Mathias*, moreover, capping the ratio of compensatory and punitive damages makes sense only when the compensatory damages are large, which the statutory cap on total damages in employment discrimina-tion cases precludes. Suppose Lust had been emotionally sturdier and incurred only $10 in emotional injury from the delay in her promotion to Key Account Manager. Would Sealy argue that in that case the maximum award of punitive damages would be $100? So meager an award would ac-complish none of the purposes, discussed in *Mathias*, for which punitive damages are validly awarded.

A more promising argument is that $273,000 is excessive given the prompt steps that Sealy took to correct the dis-criminatory denial of promotion. In *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1314 (7th Cir. 1985), a similar case,

we cut the award from $150,000 to $20,000, though in *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003), also a similar case, we upheld an award of $150,000. The award upheld in *Lampley v. Onyx Acceptance Corp.*, *supra*, 340 F.3d at 485-86, was only slightly smaller, and the award upheld in *Luciano v. Olsten Corp.*, 110 F.3d 210, 222 (2d Cir. 1997), slightly larger, but in both cases the facts were more egregious than in this case. See also *Kimbrough v. Loma Linda Development, Inc.*, 183 F.3d 782, 785 (8th Cir. 1999).

We are concerned that to uphold the award of the maximum damages allowed by the statute in a case of relatively slight, because quickly rectified, discrimination would impair marginal deterrence. If Sealy must pay the maximum damages for a relatively minor discriminatory act, it has no monetary disincentive (setting aside liability for back pay) to escalate minor into major discrimination. It's as if the punishment for robbery were death; then a robber would be more inclined to kill his victim in order to eliminate a witness and thus reduce the probability of being caught and punished, because if the murdering robber were caught he wouldn't be punished any more severely than if he had spared his victim. See *Lorenzen v. Employees Retirement Plan of the Sperry & Hutchinson Co.*, 896 F.2d 228, 232-33 (7th Cir. 1990). In light of this consideration and this court's treatment of punitive-damages awards in similar cases, we believe that the maximum such award that would be reasonable in this case would be $150,000. Cf. *Biondo v. City of Chicago*, No. 02-2707, 2004 WL 1908354, at *7 (7th Cir. Aug. 27, 2004); *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1355-56 (7th Cir. 1995).

To summarize, the judgment is affirmed except with respect to the award of punitive damages, as to which Sealy is entitled to a new trial unless the plaintiff accepts a remittitur of the excess of those damages over $150,000.

MODIFIED AND AFFIRMED.

A true Copy:

     Teste:

                      _____

                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*