AFFIRM IN PART AND REVERSE IN PART.

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:
After DynCorp International, LLC refused to renew its subcontract with Worldwide Network Services, LLC for in *449 formation-technology services, Worldwide Services commenced this action, alleging that DynCorp’s termination of the subcontract was motivated by racial animus and thus constituted racial discrimination in contracting, in violation of 42 U.S.C. § 1981. The subcontract had been entered into to assist DynCorp’s performance of its contract with the State Department to support civilian police programs in Iraq and Afghanistan.
DynCorp maintained that it terminated its relationship with Worldwide Services because of Worldwide Services’ poor performance and that the conceded racial animus of a mid-level manager, who lacked authority to end the relationship, was not imputable to the corporation under Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 291 (4th Cir.2004) (en banc) (holding that an employer will not be hable under Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act of 1967 (“ADEA”) “for the improperly motivated person who merely influences the decision, but [only] for the person[s] who in reality make[] the decision” (emphasis added)). The district court refused DynCorp’s request to apply Hill to this case and declined to give an instruction to the jury that would have barred imputation of the mid-level manager’s racial animus to the corporation for purposes of determining liability under § 1981. The court stated, “[T]he jury doesn’t have to specify which person did what.” The jury was thus allowed to consider the racial animus of individuals, including the mid-level manager, who may have influenced those who made the decision on behalf of DynCorp, but who were not themselves decisionmakers, in violation of Hill.
The majority approves this error by concluding that Hill does not apply to this case because some of the other DynCorp employees alleged to have acted with racial animus were high-level executives who may have had authority to decide not to renew Worldwide Services’ subcontract, whereas Hill applies when the plaintiffs claim “rests ... upon the discriminatory motivations of a subordinate employee.” Hill, 354 F.3d at 291. What this reasoning overlooks, I respectfully submit, is the extent to which Worldwide Services’ claim was based on the conceded racial animus of the mid-level manager, who clearly lacked authority to end the relationship between the two companies, but who was in a position to influence the decision to such an extent that the jury may have found that his racial bias was “a motivating factor in DynCorp’s decision,” which was all the district court required the jury to And before imposing liability on the corporation. Because Worldwide Services presented considerable evidence of this mid-level manager’s racial bias and his role in the deterioration of the companies’ relationship, the jury needed to be told that only the racial animus of DynCorp’s actual decisionmakers could be considered in determining whether race motivated the corporation’s decision.
Because Hill applies to determine when the racial animus of an employee is imputable to a corporation, it was error for the district court to have refused to give an instruction under Hill. And because, in this case, the mid-level manager with racial animus may, as a factual matter, have substantially influenced the decision not to renew Worldwide Services’ subcontract, the error was prejudicial. Accordingly, I believe that a new trial is necessary to permit the jury to resolve who DynCorp’s decisionmaker or decisionmakers were and whether they were actually motivated by racial animus in deciding not to renew Worldwide Services’ subcontract. Because I would grant DynCorp’s request for a new trial, I would not reach the other issues addressed by the majority, with one *450 exception. In view of the majority’s determination to affirm on liability and to provide Judge Duncan with a majority on her discussion of punitive damages, I join her discussion of punitive damages, as contained in Parts 11(D)(1) and (2).
I.
In February 2004, the ITS (International Technical Services) Division of DynCorp won a contract from the State Department to provide support for civilian police (“CIVPOL”) programs in Iraq and Afghanistan. Thereafter, DynCorp awarded a subcontract to Worldwide Services to perform communication and information-technology services for the CIVPOL program pursuant to “task orders” issued by DynCorp. The subcontract’s term extended one year (February 2004 to February 2005) and was renewable under four one-year options. DynCorp renewed the subcontract in February 2005 and again in February 2006, but not thereafter.
Worldwide Services was headed by Walter Gray and Reginald Bailey, both African Americans, and the company was certified by the Small Business Administration as a Section 8(a) disadvantaged company. Before its subcontract with DynCorp, Worldwide Services’ annual revenue was about $100,000, which was produced primarily by providing information-technology services to local businesses. During the first year of its subcontract with DynCorp, however, Worldwide Services received over $20 million in revenues.
Richard Cashon, a DynCorp vice president and its program manager for the CIVPOL program, was charged with formally evaluating Worldwide Services’ performance under the subcontract, and he gave it positive marks. In January 2006, Cashon rated Worldwide Services’ performance as “exceptional” and “very good,” noting Worldwide Services’ “technical depth in terms of the number of technically competent individuals on their staff’ and “flexib[ility] in terms of operating in a dynamic environment.” Cashon wrote that he would have no reservations about using Worldwide Services in the future. A few months later, Cashon again rated Worldwide Services’ work as “good” or “excellent” in every category and again stated that DynCorp “[wjould ... hire this contractor again.”
Despite Cashon’s positive evaluations, in early 2006 DynCorp received two letters from the State Department criticizing both DynCorp and Worldwide Services’ performance. In the first letter, the Principal Deputy Assistant Secretary for the State Department’s Bureau of International Narcotics and Law Enforcement Affairs wrote a letter to DynCorp’s CEO to complain about a number of defects in Dyn-Corp’s performance, including its supervision of Worldwide Services. The letter stated that “[Worldwide Services’] technical performance has in general been inadequate to the point where it has disrupted critical communications in the field.” The letter also made clear that DynCorp’s relationship with the State Department could be jeopardized if the problems were not resolved.
About three weeks later, a State Department representative in Baghdad sent a second letter to DynCorp that focused exclusively on the services provided by Worldwide Services in Iraq, and this letter was even more critical of Worldwide Services’ performance. It concluded that “[a] great deal must be accomplished to improve many aspects of [Worldwide Services’] service provision, levels of expertise, project management and implementation strategies to effect acceptable standards of IT/communications support.”
After receiving these letters, DynCorp developed a plan to manage Worldwide Services more actively. Bob Rosenkranz, *451 the President of DynCorp’s ITS Division, designated Richard Walsh, the Vice President for Operations, to serve as a “mentor” to help Worldwide Services improve its performance. Walsh began by having weekly meetings with Worldwide Services’ executives Gray and Bailey, and in the first meeting Walsh emphasized that Worldwide Services was “in danger of losing [DynCorp’s] business altogether” if its performance did not improve. In February 2006, Walsh traveled to Afghanistan to observe Worldwide Services’ performance on the ground and, as Walsh later testified, he found “[t]he situation ... much worse than I had thought” and observed that “the basics were not being taken care of.” Walsh was particularly concerned that those traveling into hostile areas were at greater risk because the high-frequency radio network, for which Worldwide Services had responsibility, was not working properly.
When Walsh shared his observations with Rosenkranz, Rosenkranz expressed hope that DynCorp could still “whip [Worldwide Services] into shape.” Rosen-kranz also described Worldwide Services as “one of the favored ones,” suggesting that he shared Walsh’s view that Worldwide Services received “protection” from Steve Cannon, DynCorp’s CEO and the DynCorp executive most responsible for DynCorp’s relationship with Worldwide Services.
In addition to Walsh’s efforts, DynCorp also conducted internal investigations into Worldwide Services’ performance in both Iraq and Afghanistan, and DynCorp’s management received separate reports from these investigations. The report from Iraq, completed by June 19, 2006, noted that the “concern regarding the status of IT and the [Worldwide Services] team that provides that service to [Dyn-Corp] is well-founded.” But it also noted that “recent efforts by the [Worldwide Services] team to improve the situation are typically reaching positive results” and that “[t]he current situation is a contrast from what is typically perceived as a rather negative history.” The report from Afghanistan, completed between July 22-31, 2006, found that “the CIVPOL Afghanistan program suffers from a serious IT and [c]ommunieations problem that is resulting in reduced program efficiency and effectiveness.”
DynCorp’s relationship with Worldwide Services suffered an additional serious blow when DynCorp received a third letter from the State Department — this time from the contracting officer overseeing the CIVPOL contract — complaining about Worldwide Services’ performance. This letter, dated June 23, 2006, emphasized the State Department’s “eoncern[s] about pervasive information technology (IT) performance deficiencies on all DynCorp Task Orders.” After describing a number of specific issues, the letter concluded by requesting a meeting “to discuss this broad spectrum of information technology deficiencies,” noting that “[t]he varied nature of these problems and their pervasiveness suggests that they are systemic.” Shortly after DynCorp received this letter, its Board of Directors held a meeting, at which Cannon was questioned about the State Department’s complaints. Cannon responded that “it might become necessary to replace the subcontractor in question.” Four days later, however, Cannon resigned as President and CEO of Dyn-Corp.
Cashon, the program manager, then decided not to issue any additional CIVPOL task orders to Worldwide Services in Iraq. While it was typical for the program manager to make such decisions, in this case there was evidence that Rosenkranz and Walsh participated in the decision. During the last week of July, Cashon also *452 decided to allow all remaining CIVPOL task orders directed to Worldwide Services to expire and not to renew Dyn-Corp’s subcontract with Worldwide Services.
Worldwide Services commenced this action alleging, among other things, that DynCorp’s decision not to issue further task orders and not to renew its CIVPOL subcontract was the product of intentional racial discrimination, in violation of 42 U.S.C. § 1981. At trial, Worldwide Services presented five items of direct evidence to demonstrate racial animus.
First, Charles Jones, Worldwide Services’ Deputy Program Manager in Iraq from March 2006 to August 2006, testified about racially offensive statements made by Leon DeBeer, DynCorp’s Iraq IT Manager and the DynCorp employee to whom Worldwide Services’ employees reported in Iraq. Specifically, Jones testified that in private conversations, DeBeer, a white South African, regularly referred to Worldwide Services’ Walter Gray as a “nigger,” a “bush native,” and a “kaffir.” He also testified that DeBeer regularly complained that white people “had made a grave error” by “tak[ing] the black man as a youth and attempt[ing] to clothe him and send him to school” because “the proper role of the black man was to go out and kill a lion, proving his manhood, at which point in time he should be put to work to feed his family” and “be mated with a woman so that he would have more children, who could then be put to work feeding the family.”
Second, Jones testified that while he was in Iraq, he heard Mike Kehoe, DynCorp’s Deputy Program Manager in Iraq for another State Department contract, describe the acronym for Worldwide Network Services, ‘WWNS,” as standing for “where white men never stay.”
Third, John Mack, a part owner of World-wide Services, testified that he once heard Walsh refer to Gray as “a stupid black mother — .”
Fourth, Richard Spencer, a former Dyn-Corp executive in the ITS Division who is Hispanic, testified about the lack of racial diversity among DynCorp’s ITS executives and about his belief that his ethnicity played a role in the termination of his own employment.*
Finally, Spencer also testified about a dinner he attended in October 2006 for all of Rosenkranz’s direct subordinates and their guests — approximately 40 persons— at which Bill Cavanaugh, DynCorp’s Vice President for Business Development, presented Walsh with a shirt that said, “WWNS — I took them down, and all I got was this lousy T-shirt.” Cavanaugh then proceeded to read a series of fictitious letters, the last of which purported to be from Gray. According to Spencer, Cava-naugh read the letter, “mak[ing] a bad impression of Walter” by talking like “the character on Fat Albert” and using “his interpretation of Ebonics.” Spencer testified that everybody laughed and that specifically Rosenkranz “was laughing his ass off’ and Walsh was “laughing, happy.”
*453 Recognizing that the evidence most strongly described racial animus of De-Beer, DynCorp requested a jury instruction from the district court, based on Hill, limiting those employees whose racial animus would be imputable to the corporation. Its requested instruction provided in part:
To the extent that [Worldwide Services] rests its discrimination claim upon the discriminatory motivations of a subordinate employee, [Worldwide Services] must show by the greater weight of the evidence that the subordinate employee possessed such authority to be viewed as the one principally responsible for the decision or the actual decisionmaker for DynCorp.
The district court refused to give the instruction, justifying its refusal by making a distinction between this case and Hill. The court noted that the Hill opinion was limited to employer liability under Title VII and the ADEA, whereas this case involves liability under § 1981. The court stated, “Plaintiffs pursuing claims under Title VII or the ADEA are subject to stricter scrutiny than those pursuing claims under Section 1981 because Title VII and ADEA actions must first proceed through the EEOC process.” The court noted that our decision in Hill has “never been extended beyond claims brought under Title VII and the ADEA,” and it “decline[d] to be the first court to expressly do so.” The court concluded that “the Hill standard is not a correct statement of law for claims brought under 42 U.S.C. § 1981.”
Rather than limit DynCorp’s discrimination liability under § 1981 to the standard stated in Hill, the district court instructed the jury that the “race of [Worldwide Services’] owners ... must have been a factor that actually led to the decision ... not to renew or extend [Worldwide Services’] CIVPOL subcontract or task orders.” (Emphasis added).
The jury found that DynCorp’s decision not to renew or extend Worldwide Services’ CIVPOL subcontract or task orders was based in part on racial animus imputed to the corporation, and it returned a verdict in favor of Worldwide Services on its § 1981 claim, awarding it $8.42 million in compensatory damages and $10 million in punitive damages. From the judgment entered on the jury’s verdict, DynCorp filed this appeal.
II.
DynCorp’s decision not to renew its subcontract with Worldwide Services was a corporate decision, and the corporation’s management testified that the corporate decision was made by executives whose motive for ending the relationship with Worldwide Services was only business oriented — based on Worldwide Services’ poor performance, as graphically demonstrated by the three letters of complaint from the State Department — and not for any reason of race.
Worldwide Services alleges that race was a motivating factor, and the vast bulk of its direct evidence of racial animus bore on DeBeer, the IT Manager in Iraq.
As a middle manager, DeBeer’s views about Worldwide Services’ performance were influential in that Cashon listened to executives both below and above him. But DeBeer was not the decisionmaker or even one of several possible decisionmakers. Everyone at DynCorp testified that the person who had the authority to make the decision not to renew Worldwide Services’ subcontract was Cashon, the manager for the CIVPOL program, who concededly did not have any racial animus toward Worldwide Services. Indeed, he was a strong supporter of the firm until evidence started coming in about its deficiencies. There *454 was also testimony that two other Dyn-Corp executives, Rosenkranz and Walsh, participated in the decision. While there was some evidence of racial animus imputable to them, it was much weaker and more isolated than that imputed to De-Beer. Specifically, testimony showed that Rosenkranz and Walsh laughed at racial jokes directed at Worldwide Services told at a dinner and that Walsh once make a racial slur about Worldwide Services’ Walter Gray.
In short, without the racial animus of DeBeer, no one can predict how the jury might have ruled. The record amply supports DynCorp’s suggestion that, absent DeBeer’s racial animus, the evidence may have been too weak as a matter of law to support a § 1981 claim and that therefore DeBeer’s racial animus was critical. Because the district court allowed DeBeer’s racial animus to be considered by the jury in deciding whether DynCorp’s decision was racially motivated, it is a real possibility that it allowed the jury to find § 1981 liability erroneously. This is because De-Beer, as the subordinate of Cashon, had influence on Cashon’s decision on behalf of DynCorp. Without testimony of DeBeer’s racial animus, the jury was essentially left with direct evidence that Rosenkranz and Walsh laughed at racial jokes about Worldwide Services and Walsh once spoke a racial slur about Gray.
Thus, it was likely critical to the jury’s verdict whether DeBeer’s racial animus could be imputed to DynCorp as a motivating factor in its not renewing Worldwide Services’ subcontract. Had the district court applied Hill, the jury would have been told that DynCorp was not “liable ... for the improperly motivated person [DeBeer] who merely influences the decision.” Hill, 354 F.3d at 291. We explained in Hill that an employee, such as DeBeer, does not become a decisionmaker whose discriminatory motivations may be attributed to the employer “simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.” Id. (emphasis added). If Hill had been applied, the jury would have been told that Worldwide Services had to prove that DeBeer “possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer” before it could consider the impact of De-Beer’s racial animus. Id. (emphasis added). Based on the testimony in this record that Cashon made the decision with Rosen-kranz and Walsh and that DeBeer did not have the authority of one principally responsible for the decision but could only be tagged as one having influence on it, De-Beer’s racial animus would not have been imputable to DynCorp.
In limiting a corporation’s liability for racial discrimination in Hill to the conduct of persons actually responsible for the corporation’s action, we carried out Congress’ intent to hold a corporation responsible for racial discrimination only when its executives and employees responsible for the corporation’s decision acted with racial animus, not when any corporate employee manifested racial animus.
The district court, however, rejected the application of Hill to § 1981 and instead instructed the jury that the race of Worldwide Services’ owners “must have been a factor that actually led to the decision” to terminate DynCorp’s relationship with Worldwide Services. As a result, the jury was permitted to consider the racial animus of any employee whose influence “actually led to the decision.” The district court thus extended corporate liability for § 1981 to the actions of any person who influenced the decision, regardless of whether that person was a decisionmaker. *455 If Hill was applicable, the district court’s instruction was legally erroneous.
Not only was the district court’s instruction erroneous under Hill, if Hill was applicable, the error was material to the outcome in this case. Without consideration of DeBeer’s racial animus, the evidence to support a verdict was thin, perhaps even fatally thin, and the district court surely recognized this. It devoted substantial discussion to why it decided not to give the Hill instruction, concluding that Hill was “not a correct statement” of § 1981 law and that corporate agency for discrimination under Title VII was “subject to stricter scrutiny” than corporate agency under § 1981. Indeed, the court acknowledged the importance of Hill when it stated that it “adopted whole cloth DynCorp’s proffered Section 1981 jury instructions, excluding only the language specifically addressing Hill’s holding.” (Emphasis added).
The dispositive question on appeal, therefore, reduces to whether Hill accurately describes when the racial animus of corporate employees may be imputed to a corporation for purposes of the corporation’s liability for racial discrimination under § 1981. I submit that how racial animus is imputed to a corporation for corporate liability is the same issue, whether discrimination is alleged to be in violation of Title VII or of § 1981, as we have so recognized. Indeed, the majority, too, assumes that Hill applies to § 1981 claims. This assumption is, I believe, correct and determinative of this appeal.
III.
In Hill, a former Lockheed mechanic, whose employment was terminated on the basis of three written reprimands, brought an action against her corporate employer under Title VII and the ADEA, alleging that her team’s safety inspector’s discriminatory animus led him “to report admittedly valid infractions,” resulting in her second and third reprimands. Hill, 354 F.3d at 283. Hill’s claim therefore rested on her argument that the safety inspector’s alleged discriminatory animus should be imputed to the corporation. Hill did not dispute that she had violated corporate rules and standards, and she did not assert that her direct supervisors, who issued the reprimands, or her two program managers, who terminated her employment, acted with discriminatory animus. The district court granted Lockheed’s motion for summary judgment, and we affirmed. We held that Hill could not base a claim on the safety inspector’s animus because he was not one of the corporation’s decisionmak-ers with respect to the decision to issue reprimands to Hill or to terminate her employment.
In reaching this result, we held that “an employer will be hable not for the improperly motivated person who merely influences the decision [to take an adverse employment action], but for the person who in reality makes the decision.” Hill, 354 F.3d at 291 (emphasis added). To be sime, we did not limit corporate liability under Title VII and the ADEA to the actions of only “formal decisionmakers for the employer,” because doing so might allow employers “to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers.” Id. at 290 (emphasis added). But we also rejected the notion that the discriminatory motivations of an employee may be attributed to the employer “simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.” Id. at 291. Thus, we concluded that in determining a corporation’s liability under Title VII or the ADEA, the focus must be on the motivations of those agents of the corporation who actually made the *456 adverse employment decision on behalf of the corporation:
In sum, to survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.

Id.

Even though Hill defined corporate liability under only Title VII and the ADEA, the agency issue resolved in Hill exists under any discrimination statute creating corporate liability. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 638 (1998). More to the point, in § 1981 claims, courts must answer the same “general question [of] the proper extent of a[] [corporate] employer’s responsibility for the offensive acts of its employees.” Dennis v. County of Fairfax, 55 F.3d 151, 155 (4th Cir.1995). And Congress, in drafting § 1981, need not have provided an explicit direction to be clear that this question “implicates principles of agency law.” Id. at 155. Indeed, we have previously recognized that the same general agency principles apply in interpreting § 1981 as apply in interpreting Title VII. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184, 186-90 (4th Cir.2001) (noting that under both § 1981 and Title VII there must be “some basis for imposing liability on [the corporate defendant]” and analyzing the employer’s liability for a racially hostile work environment without distinguishing between the two statutes (internal quotation marks and citation omitted)); Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 441 (4th Cir. 2000) (using the Title VII standard for imputing liability to a corporate employer for conduct alleged to justify punitive damages under § 1981).
Moreover, it would be analytically discordant not to apply Title VII agency principles to § 1981 agency questions. An employee alleging that his corporate employer intentionally discriminated against him on the basis of race, in violation of both Title VII and § 1981, would oddly be able to demonstrate his employer’s liability under § 1981 for the discriminatory motivations of an employee who substantially influenced, but did not make, the decision to take an adverse employment action against him, but he would not be able to do so under Title VII. Similarly, an employee alleging intentional discrimination on the basis of sex or religion premised on a subordinate employee’s influential animus would have no recourse, while her coworker’s analogous § 1981 claim would succeed. While we must recognize that Title VII and § 1981 provide “separate, distinct, and independent” causes of action, Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 461, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the standard for imputing racial animus to a corporation in making out each claim must, out of logical and practical necessity, be the same.
Worldwide Services argues bluntly that Hill should not be expanded because it was erroneously decided, relying on decisions in other circuits that have criticized Hill. See Poland v. Chertoff, 494 F.3d 1174, 1182-83 (9th Cir.2007) (finding Hill’s rule too narrow and holding instead that “even if the biased subordinate was not the principal decisionmaker, the biased subordinate’s [improper] motive will be imputed to the employer if the subordinate influenced, affected, or was involved in the adverse employment decision”); EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 487 (10th Cir.2006) (critiquing Hill’s “peculiar focus on who is a decision- *457 maker for purposes of discrimination actions” on the ground that, under agency law principles, an employer’s agents “include[ ] not only ‘decisionmakers’ but other agents whose actions, aided by the agency relation, cause injury” (internal quotation marks and citation omitted)); Lust v. Sealy, Inc., 383 F.3d 580, 584 (7th Cir.2004) (criticizing Hill as “inconsistent with the normal analysis of causal issues in tort litigation”); cf. Ricci v. DeStefano, — U.S. -, 129 S.Ct. 2658, 2689, 174 L.Ed.2d 490 (2009) (Alito, J., concurring) (noting circuit split and describing Hill as adopting “[t]he least employee-friendly standard” by “ask[ing] only whether ‘the actual decisionmaker’ acted with discriminatory intent”). But, it would be inappropriate for us to limit Hill arbitrarily, which is precisely what we would have to do in order to conclude that the agency principles announced in Hill do not apply to § 1981 actions. Worldwide Services’ argument that Hill was wrongly decided can only be directed to this court sitting en banc.
In sum, the issue of when to impute the racial animus of an employee to a corporation for liability under Title VII and § 1981 must be and, indeed, is the same. See Spriggs, 242 F.3d at 184, 186-90; Lowery, 206 F.3d at 441. It was thus prejudicial error for the district court to have concluded that the standard was different and to have refused to instruct the jury on the Hill standard for determining whether the racial animus of DeBeer was imputable to DynCorp in connection with DynCorp’s decision not to renew the subcontract with Worldwide Services. Because a new trial on Worldwide Services’ § 1981 claim is thus required, I would vacate the judgment on the § 1981 claim, including the award of punitive damages, and remand for a new trial, requiring the district court to instruct the jury on Hill.

 The majority attributes Spencer’s termination to Rosenkranz and repeatedly refers to it as evidence of Rosenkranz’s racial animus. But Spencer testified that while Rosenkranz signed his termination letter, Spencer had a "fairly good” relationship with Rosenkranz, who is "not a bad guy.” Spencer instead suggested that his termination was the decision of Herb Lanese, DynCorp’s CEO at the time, who did not like Spencer "for whatever reason." Moreover, Spencer did not attribute any racial motivation to Rosenkranz in signing the letter. Considered in its full context, Spencer’s testimony about his termination should not be used to impute racial animus to Rosenkranz.